THE WACO TAP RAILROAD COMPANY v. THOMAS M. SHIRLEY.

1.  Where a bond with security is exacted of a contractor to secure against his failure or inability to comply with the terms of his contract, it cannot be annulled or rescinded for misrepresentations made by him as to his solvency.

2.  In a suit to cancel or rescind a contract brought against a contractor from whom a bond with security had been exacted, evidence of the insolvency of the contractor is irrelevant and properly excluded.

3.  In a suit by a contractor against a railroad company for damages for breach of contract, it is admissible for the railroad company to show the inability of the contractor to perform his obligations, and that he was unable to respond in damages for the purpose of showing that the loss of the profits which would have been realized by a completion of the contract by the contractor was attributable in part at least to such inability.

4.  It is not in all cases required that a railroad company wait until it is too late to have work stipulated to be done by a contractor, completed by the desired time, in order that the contractor's inability

to comply with his contract be demonstrated, on peril of paying him all the profits to be realized from a performance of his contract; but before taking action in breaking off the contract the failure of the contractor must be shown to have been imminent, &c.

5. PRACTICE—EVIDENCE.—If evidence is not admissible for the purpose for which it is offered, this court will not reverse, if the testimony would have been admissible for another purpose in the trial below.

6. CONTRACT.—The failure of the sureties to a contract subsequent to its execution, is not a sufficient ground for the other party breaking it, without allowing an opportunity of furnishing new securities.

7. MEASURE OF DAMAGES—FUTURE PROFITS.—While it is a general rule that future profits cannot be allowed in estimating damages, whether the action is on contract or tort, yet the exception to it is equally well settled that where labor is to be performed from which profit is to spring as the direct result of work done at a contract price, and one party is prevented from earning such profit by the wrongful act of the other, the law will presume that such loss is the direct and natural result of the breach of the contract, and may be estimated in computing damages.

8. DAMAGES.—It is the purpose of the law to compensate the party injured for the loss which he has sustained by the wrong done him.

9. SAME.—While the difference in what it costs to do the work, and the price to be paid for it, is to be taken into the estimate in an action by a contractor prevented from performing his contract, it is not the sole guide or the only fact to be considered in ascertaining the damages.

10. SAME—TESTIMONY OF EXPERTS.—The probable cost of completing a contract for the construction of a railroad may be satisfactorily established by proof of the value of the material, labor, and skill required. To effect such proof, resort can be had to the opinion and judgment of men who are shown to have information and experience which qualify them to testify as to such matters.

11. SAME—MEASURE OF DAMAGES.—The cause of action accrues immediately upon the breach of the contract. Suit may be brought at once ; witnesses have therefore to estimate the cost of labor and materials at that date; the contractor is relieved from all anxiety, trouble, and labor about the completion of the work ; it is attendant with no further risk on his part, he has to make no additional outlay, and is entitled to his damages immediately. These things should be taken into consideration, and to that extent it may be held that the rule is limited; that the difference between the cost of doing the work and what was to be paid for it is the measure of damages.

12. MORTGAGE.—Stipulations in a contract for mortgages for such sums as are specially mentioned in the contract raise the implication that

no other or different mortgage or lien was to be given; and an agreement for mortgage "for the advancements made or money so expended by him," under the contract does not include damages for the breach of the contract, but does have in equity the effect of a mortgage to the extent indicated.

13. MISTAKE—REFORMING CONTRACT.—To authorize a court of equity to reform a contract, on the ground of an important omission, it devolves on the party asking such relief to establish satisfactorily the mistake and the terms of the contract as sought to be established with that intended by the parties at the time of its execution.

14. SAME.—See facts insufficient to authorize a court to reform a contract.

15. CONTRACT BY AGENT.—Where an agent's authority to make a contract is subject to ratification by the principal, and in accordance with negotiations between the agent and the other contracting party, a contract is executed with the principal, the fact that such contract omitted a part of the agent's stipulations would be ground for relief and to cancel the contract as against the principal; but such omission could not be, by order of the court, ingrafted into the contract against the principal.

16. ENFORCING SALE OF RAILROAD FRANCHISE.—It is proper that the sheriff be named by the decree as authorized to enforce it by making sale of road, road-bed, and franchise of a company against which a decree of foreclosure is rendered.

APPEAL from McLennan. Tried below before the Hon. D. M. Prendergast.

Thomas M. Shirley sued the Waco and Northwestern Railroad Company to the Fall Term of the District Court of McLennan county, 1869, setting up the contract following, and alleging that plaintiff had in all things complied with the preliminary obligations on his part to its validity; his active entrance upon his work under it; his successful and energetic work towards the completion of said work, and that the officers of said company, without cause, and in wrong, had broken off the same; withheld pay for his labor, loss, and damage, and damages from the breach of said contract, in the loss of great profits, which he was deprived of by not being permitted to comply with his work and complete said labor, &c. Damages were laid at $300,000, and judgment was asked enforcing the equitable mortgage im-

plied in the contract by sale of the franchise, road, road-bed, &c., &c.

The defendant demurred, pleaded general denial; that Shirley and his sureties had imposed upon the company— both the plaintiff and his bondsmen being insolvent—facts not known to defendant, and concealed from them by the plaintiff; that plaintiff had virtually abandoned his contract; that his property had been seized by attachment, at suit of a sub-contractor, so that he had not the ability to proceed with his work under the contract; that at the time of the contract plaintiff was a bankrupt, his petition in bankruptcy having been filed, and proceedings in the case being still pending when the contract was signed; that at no time had the plaintiff the ability to go on with the work as contracted for.

December, 1874, plaintiff amended, claiming that by a preliminary contract made by him and J. W. Speight it was understood that a mortgage was to be executed by the company securing plaintiff against all loss and damage of every kind, to be upon the road, road-bed, franchise, &c., which stipulation, by mistake or otherwise, was omitted from and did not appear in the contract executed. Plaintiff asked that the contract be reformed so as to give him a lien for damages, &c., upon the road, &c.

Exceptions were made to the various pleadings. The testimony was voluminous. From the contract and the proceedings taken in declaring the contract forfeited, with the opinion of the court, the case will be understood.

"'THE WACO TAP RAILROAD COMPANY.

"Articles of agreement, made and entered into this 29th day of July, 1869, between Thomas M. Shirley, of the city of Houston, of the one part, and the Waco Tap Railroad Company, of the other part, whereby it is covenanted and agreed as follows, viz:

"First. That the said Thomas M. Shirley, contractor, does hereby covenant and agree to form and prepare, finish and

execute in a thorough and workmanlike manner, the clear-ing grubbing, excavations, embankments, trestling, surfacing, track-laying, and to furnish the cross-ties of the said road entire, from the junction of the Houston and Texas Central Railway Company to the city of Waco.

" *Second.* The execution of this contract shall conform, in all respects, to such specifications, and to such plans or pro-files, or to such notes of surveys and levels, as may from time to time be furnished by the engineer of said corpora-tion ; but the same shall be regulated and controlled, never-theless, by the specifications, so far as they relate to this con-tract, and marked A, which is made a part and parcel of this contract. And whatever additions and alterations in the line, levels, plans, or specifications the engineer may con-sider expedient during the progress of the work shall be made upon the same terms and according to the same rates of prices as other similar kind of work under this contract.

" *Third.* The work under this contract shall be commenced on or before the 1st day of September, 1869, and shall be made and completed on or before the 1st day of September, A. D. 1871, and for a failure to make and complete the same within the time fixed for its completion, the engineer, for the time being, may assess such damages as may be just and equitable, and charge the contractor with the amount thereof; and the engineer may, after giving thirty days' written notice to the contractor to increase his force, so as to hasten the comple-tion of said contract, and on his failure to do so, employ other assistance as in his opinion may be necessary to the completion of the work within the specified time, and the expense of such assistance shall be paid by the contractor ; but if the execution of any part of the work be delayed by act or failure on the part of the beforementioned corpora-tion, the contractor shall, at the time of such hindrance, give notice thereof in writing to the engineer, and with respect to the portion of work thus delayed, shall, upon such notice,

become entitled to an extension of time of completion named in this contract equivalent to the time of such delay.

"*Fourth.* The contractor shall not transfer this contract without the consent of the president of this company. All sub-contracts made by the contractor shall be considered under his immediate charge, and he shall at all times manage the same as if no sub-contract existed. The contractor shall, upon the application of the engineer, for the time being, discharge any workman or laborer from his employment, and shall not employ any workman or laborer who has been discharged for improper or disorderly conduct. The contractor will co-operate in the maintenance of such system of police, and will conform to such regulations as in the opinion of the engineer, for the time being, shall conduce to the regular and peaceable progress of all parts of the work, and tend to prevent all unnecessary interference with the rights, privileges, and property of persons in the vicinity of the railroad.

"*Fifth.* On condition of the fulfillment by the contractor of the foregoing provisions of this contract, the said Waco Tap Railroad Company doth hereby promise and agree that said corporation shall and will, for doing and performing the work as aforesaid, pay, or cause to be paid, to said Thomas M. Shirley, the said contractor, or to his heirs, executors, assigns, or administrators, at the rate of twenty-five cents per cubic yard, for excavation or embankment in common earth and clay; for hard-pan or such other material not herein specified as cannot be removed in greater quantities than six cubic yards per day by an experienced, first-class railroad laborer, forty cents per cubic yard; excavation in loose rock, seventy-five cents per cubic yard; excavation in solid rock, one dollar and ten cents per cubic yard; grubbing, per chain of one hundred feet, five dollars; clearing, twenty feet wide, three dollars and a half per mile; cross-ties, forty-five cents each; trestling, six dollars and a half per line, solid foot; surfacing, one dollar and a half per mile; laying track, five

dollars and a half per mile; compensation for the labor above, all to be paid in American gold, at the office of the company.

"*Sixth.* The engineer, for the time being, shall decide on the quantity and quality of the work done, in accordance with the specifications hereto attached.

"*Seventh.* Monthly estimates, during the progress of the work, shall be made by the engineer, of work done to his acceptance, to such amount as shall, in his judgment, be a fair average value of the same, agreeably to this contract, and of the amount so estimated the contractor shall be paid 85 per cent.; and when the whole work hereby contracted for shall have been accepted by the engineer, as completed agreeably to this contract, the balance shall forthwith be paid to the said Shirley;    *    *    and the said company will secure to said contractor the payment of the said 15 per cent., as well as any other sum that may be due and unpaid, by mortgage on their road-bed, superstructure, rolling-stock, lands, franchises, and other property, the said mortgage to be duly executed as soon as the reserved 15 per cent. on the work done shall amount to the sum of $20,000, together with any other sum or sums that have accrued or become due, which mortgage shall be payable on the final completion of the entire work. At the end of each and every month the company shall give their note, bearing ten per cent. interest, for whatever sum may be due upon the monthly estimate, as also the reserved percentage, to be secured as above specified. The company shall also execute their notes, with ten per cent. interest from the date of purchase, for all iron, rolling-stock, or other material or property that the contractor may purchase by approval of the president of the company, which notes shall in like manner be secured by mortgage as above specified. As the work specified in this contract is not required to be done before the expiration of twenty-four months, it is hereby expressly understood and agreed that said company is not compelled to pay said contractor on any monthly

estimate more than 85 per cent. of one twenty-fourth part of the entire work to be done; provided, however, that if the said Shirley shall complete more than the one twenty-fourth part of the whole contract in one month, then the said company shall pay the full amount of each such monthly estimate, less the 15 per cent. reserved, if in funds. And it is also agreed between the above contracting parties, that should the work, or any portion of it, executed under this contract, not be of such quality as is herein stipulated to be made—that is to say, that if the work, or any portion of it, in the opinion of the engineer, be constructed in an inferior manner, then, and in such case, the monthly or final payment above provided for may be withheld until such time as the engineer shall decide that the spirit of this contract has been complied with; or, instead thereof, the engineer may make such deduction from the prices herein stipulated to be paid as may be fair and right; provided, however, that the engineer shall notify the contractor, during the progress of the work, stating plainly and explicitly wherein the work being done does not conform to the contract and specifications, and after the work shall have been completed without notice, it shall not be complained of by the engineer.

"*Eighth.* And it is further agreed between the parties hereto, that in case the said contractor shall refuse or neglect to perform all the covenants hereinbefore enumerated, or shall violate the spirit hereof, upon the engineer certifying such neglect, refusal, or violation to the president of said company, the president may, at his option, after careful investigation and due notice to the contractor, and his refusal to remedy the evils complained of, declare this contract null and void; and in that case, whatever balance may be due and unpaid for work done, shall be forfeited to the use of said company, or such part thereof as may be equitable and just; and the said president may proceed to re-let or dispose of the work remaining to be done as if this agreement had never been made.

"*Ninth.* And it is further agreed between the contracting parties, that the iron shall be laid and the road finished complete as fast as sections of ten miles can be prepared for the rails; and the company obligate themselves to provide iron and an engine and necessary cars to haul the necessary supplies of the contractor and distribute the iron, ties, &c., as the work progresses; and the contractor shall have the privilege of operating the road and be entitled to all the profits arising therefrom as finished until all claims are fully paid off and discharged by the company. A final estimate is to be made, and the grading accepted by the company as fast as completed, in sections of three miles. It is further agreed that the contractor shall have the right to construct the bridge for the railroad over the Brazos river, according to such plans and specifications and upon such terms as may hereafter be agreed upon between the contractor and the president of the company; and such agreement so to build said bridge, shall, when so made, be considered part and parcel of this contract. The contractor shall, contemporaneously with the signing of this contract, enter into a bond or obligation with said company, to be considered a part of this instrument, with security, to be approved by the president of this company, for the faithful compliance with and fulfillment of this contract.

"*Tenth.* Should the work be suspended by the said company for six months, or this contract be plainly violated on their part, then in that case this contract shall be null and void at the option of the contractor, and all sums due the contractor, as well as the fifteen per cent. retained, shall become due, and the mortgage shall be foreclosed; and it is further agreed that the mortgage shall be so drawn that, in the event of such contingencies, it may be foreclosed without delay or involving the contractor in litigation. It is further considered a part of this contract that the president and directors shall do all in their power to aid the contractor in obtaining labor, supplies, timber, &c., and to lend their cordial support and

influence to facilitate the contractor in every way in the prosecution of the work.

"*Eleventh.* When said company shall have paid or secured to the satisfaction of the contractor of the work herein specified the sum of $150,000, then the said contractor hereby obligates himself to advance toward the said work the sum of $25,000 in work; and when the said company shall have paid to, or secured as aforesaid, the further sum of $50,000, then the said contractor hereby binds himself to advance the further sum of $25,000 in work. And when the said company shall have paid or secured, to the satisfaction of the contractor within, $100,000, of whatever sum that may be requisite to complete the road, the contractor hereby obligates himself to complete the entire work herein contemplated and specified in this contract: *Provided,* That mortgage shall be executed by the company to the said contractor for the advancements made or money so expended by him, as hereinbefore provided in this contract. All sums of money to be paid or notes to be given, as specified in this contract, shall and are to be paid in American coin.

" *Twelfth.* In case of default or failure on the part of said contractor, he binds himself to account and pay and be liable to said company, at its office in the city of Waco, for all loss, injury, or damage by it thereby sustained.

"In testimony of all of which the said contracting parties have signed their names and affixed their seals (using scrolls for seals) at Galveston, the day and date first above written.

"The Waco Tap Railroad Company signed by their president, subject, however, to the approval of the board of directors of said company. Interlineations before signing.

"(Signed)     THE WACO TAP RAILROAD COMPANY,

By J. W. SPEIGHT, *President.*

THOMAS M. SHIRLEY.

"Countersigned by the directors: J. E. Harrison, E. C. Stewart, Thomas P. Aycock, William A. Fort, John T. Flint, E. A. Sturgis, Richard Coke."

LETTER WRITTEN BY E. L. HERIOTT TO T. M. SHIRLEY.

"GALVESTON, TEXAS, *March* 23, 1870.

"T. M. SHIRLEY, Esq., Houston, Texas.

"DEAR SIR: It is with regret that I am obliged to call your attention to the inclosed copy of a resolution passed by our directors on the 18th instant. The condition your work is now in, your total failure to carry out the contract according to its intent and spirit, amounts to a failure on your part; you are hereby required to comply strictly with the requirements required in the inclosed resolution, except that you will be allowed twenty-five days from the receipt of this notice, which will make thirty-two days from its passage, to carry out the demands there made. I am further instructed to inform you that no estimates will be paid you till your work is in a more satisfactory condition. You will please acknowledge the receipt of this by telegraph to me at Houston.

"(Signed)     E. L. HERIOTT, *Chief Engineer.*"

"WACO, TEXAS, *March* 18, 1870.

"*Resolved*, That the engineer serve a notice to the contractor to put one hundred working hands upon the work within fifteen days from this time, and that he keep that many hands constantly employed, and that a default in these requirements will be treated as a violation of the contract; and the president and engineer are requested to hold the said contractor to a rigid performance of the contract."

"E. L. HERIOTT, *Engineer Waco Tap Railroad Co.*

"I above transmit you a copy of a resolution of the board of directors, passed this day, for your observance.

"Yours, truly,

"(Signed)     JOHN T. FLINT,
"*Pres. Waco Tap R. R. Company.*"

"WACO, 2*d April.*

"To THOMAS M. SHIRLEY.

"I have declared your contract null and void, and will not

recognize you any longer as a contractor on the Waco Tap Railroad.      (Signed)      JOHN T. FLINT,

"*Pres. W. T. R. R. Co.*"

"WACO TAP RAILROAD.

"CONTRACTORS AND HANDS WANTED.

"Thomas M. Shirley having virtually abandoned the work on the Waco Tap Railroad, and violated in other respects the spirit of his contract, the same is declared null and void this day, and the said Shirley will no longer be recognized as a contractor thereon.    Contracts for section work, general work, and for ties and bridging are solicited, and general laborers wanted.    Good prices will be paid.

"(Signed)      JOHN T. FLINT,

*Pres. W. T. R. R. Co.*

"WACO, *April 2,* 1870."

The jury returned a verdict as follows:

"We, the jury, find for the plaintiff of reserved percentage, with interest to date, $2,265.15 American coin.    (2) For work done, with interest to date, $3,503.80 American coin. (3) For actual damages, in American coin, $1,612.    (4) For exemplary damages, in American coin, $100,612.    (5) We, the jury, find for the plaintiff on the question of mistake in the contract.    (6) And we find the plaintiff entitled to a valid prior lien on the franchises, road-bed, and property of the company."

Judgment was rendered for the amount found by the jury, and ordering the sheriff of McLennan county to make sale of the franchise, road, &c., and make title to the purchaser, &c., to satisfy the judgment.

Motion for new trial having been overruled, the defendant prosecuted his writ of error.

*George Goldthwaite, James A. Baker,* and *Herring & Anderson,* for the plaintiff in error, cited Bulkley *v.* United States, 19 Wall., 40; United States *v.* Babbit, 1 Black, 61; Master-

ton v. City of Brooklyn, 7 Hill, 62; Phila., Wil. & Balto. R.
R. Co. v. Howard, 13 How., 307; United States v. Speed, 8
Wall., 77; Kerr on Fraud and Mistake, 421; Lyman v. Mu-
tual Ins. Co., 17 Johns., 375; Marquis of Townshend v. Stan-
groom, 6 Ves. Jr., 328; Gillespie v. Moon, 2 Johns. Ch., 585;
Tucker v. Madden, 44 Me., 215; Story's Eq., § 157; Chandler
v. Meckling, 22 Tex., 42; Gibson v. Hill, 23 Tex., 83; Green
v. Hill, 4 Tex., 465; Smelser v. The State, 31 Tex., 95; Shrop-
shire v. Doxey, 25 Tex., 127; Iglehart v. Downs, 19 Tex., 244;
Rogers v. Broadnax, 27 Tex., 240; Linney v. Peloquin, 35
Tex., 29; Simonton v. Forrester, 35 Tex., 585.

*E. A. McKinney,* for defendant in error, cited Sedg. on
Dam., 35, 67, 75, 79, 108, 522; 2 Tex., 460; Randon v. Bar-
ton, 4 Tex., 292; Calvit v. McFadden, 13 Tex., 324; Carroll
v. Welch, 26 Tex., 147; Phila., & B. R. R. Co. v. Howard, 13
How., 344; Masterton & Smith v. Mayor and City of Brook-
lyn, 7 Hill, 61; Nebraska City v. Campbell, 2 Black, 590;
Shepherd v. Hampton, 3 Wheat., 200; 3 Pars. on Con., 184;
Graham v. Roder, 5 Tex., 148; Cook v. Garza, 9 Tex., 358;
Champion v. Vincent, 20 Tex., 811; Thouvenin v. Lea, 26
Tex., 612; Becton v. Alexander, 27 Tex., 659; 1 Greenl.
Ev., §§ 313, 322; 2 Pars. on Con., 562; Bradley v. Wash-
ington, &c., Steam Packet Co., 13 Pet., 94; Mechanics' Bank
v. Bank of Columbia, 5 Wheat., 326; Packet Company v.
Sickles, 5 Wall., 580; Stamper v. Johnson, 3 Tex., 1; Luck-
ett v. Townsend, 3 Tex., 119; Stephens v. Sherrod, 6 Tex.,
294; Collins v. Tracy, 36 Tex., 546; H. & G. N. R. R. Co.
v. Kuechler, 36 Tex., 382.

*Thomas Harrison,* also for defendant in error, cited and dis-
cussed Hillyard v. Crabtree, 11 Tex., 264; Carroll v. Welch,
26 Tex., 149; Britton v. Turner, 6 N. H., 497; Sedg. on Dam.,
73, 364; Perry on Trusts, sec. 248 and note; In the Matter
of Howe and Wife, 1 Paige, 125; Clark v. Sibley, 13 Met.,
210; Eaton v. Green, 22 Pick., 526; 2 Wash. on Real Est.,

43; 1 Williams on Mort., 4; Farquhar *v.* Dallas, 20 Tex., 200; Converse & Co. *v.* McKee, 14 Tex., 20; Hall *v.* Layton, 16 Tex., 262; Robinson *v.* Davenport, 40 Tex., 342.

*George Clark* and *Jones & Henry*, also for defendant in error.

MOORE, ASSOCIATE JUSTICE.—On the 26th day of July, 1870, Thomas M. Shirley, the defendant in error, brought suit against the Waco Tap Railroad Company for the recovery of damages for alleged violation of a contract made on the 29th day of July, 1869, wherein he, said Shirley, undertook and bound himself to construct said company's road, from its junction with the Houston and Texas Central Railway to the city of Waco. On the trial of the cause a judgment was rendered against the plaintiff in error for the sum of one hundred and seven thousand six hundred and eighty dollars and ninety-five cents, in American coin, and for the foreclosures of a lien on the road, road-bed, and franchises of said company, to which said Shirley was adjudged to be entitled, to secure the payment of said damages so found to be due him.

Many errors are assigned for the reversal of the judgment. We need consider, however, only such of them as are relied upon and discussed by counsel for plaintiff in error. These in effect present the following propositions:

*First.* Plaintiff in error was induced to enter into said contract through fraud and imposition of said Shirley, and it was therefore null and void.

*Second.* Plaintiff in error was entitled to annul said contract by reason of the insolvency of Shirley, and want of means to comply with and perform it.

*Third.* The court erred in excluding the testimony offered by said railroad company tending to prove the insolvency of Shirley at the date of the contract, and also when it was annulled, which was relied upon to show that said contract was void for fraud, and also that said company was entitled to

cancel and annul it on account of the insolvency of said
Shirley.

*Fourth.* The court should have admitted said testimony on
the question of damages.

*Fifth.* The objection to the evidence offered by Shirley to
show the damages sustained by breach of the contract should
have been sustained, and the charge of the court on the
measure of damages was erroneous; and the finding of the
jury in this respect was not warranted by the law or evidence.

*Sixth.* The decree giving Shirley a lien on the road, road-
bed, and franchises of said company was not authorized by
the law or facts.

*Seventh.* The decree directing the enforcement of said lien
by the sale of said road, road-bed, and franchises is illegal and
erroneous.

In respect to the first two of these propositions, it will suf-
fice to say that it is a plain inference from the contract that
the plaintiff in error was not induced to enter into it from
any supposed confidence as to, or belief of, Shirley's solvency
or individual pecuniary ability to perform it. Satisfactory
stipulations to secure plaintiff against his failure or inability
to comply with the contract were embodied in it. We must
infer that plaintiff was satisfied with and relied upon these
stipulations, instead of belief in, or dependence upon, repre-
sentations by Shirley as to his pecuniary condition. The
charge of the court on the question of Shirley's solvency and
his representations in regard to his pecuniary condition, and
that of his bondsmen, was unquestionably as favorable to
plaintiff as could be asked. The testimony in the records is
certainly amply sufficient to justify the finding of the jury
on these points, in favor of defendant in error, if indeed it
would have admitted of any other conclusion than that which
they drew from it.

If, as we have already said, the contract was not made on
the faith of Shirley's solvency, or upon any representations
of his, as to his own or his bondsmen's pecuniary condition,

there was certainly no error in rejecting the testimony offered to prove that he was insolvent and had no means or property. If such testimony could, under any circumstances, have been received, for the purpose for which it is said in the bill of exceptions it was proffered, it only could have been on the predicate that plaintiff in error had shown or proposed to show that the contract had been in fact made on the faith of Shirley's representations. But no such predicate was laid, nor was there any proof to do so at a subsequent stage of the case. On the contrary, it was shown that the president of the company was fully informed of Shirley's pecuniary condition, and he and the company expressed full and entire satisfaction with the bond given by him, as stipulated in the contract.

The point is made in this court that the testimony excluded was relevant, and should have been admitted, on the question of damages; for it is said if Shirley was insolvent and unable to carry on and fullfil the contract, although up to the date of its annulment he had not been in default, and the company may not have been authorized to treat it as void for fraud in its execution, or cancel it for a breach on his part, still, if he was unable to consummate and complete it, he would not be entitled to the same amount of damages as otherwise he might recover. We fully admit the force of this suggestion in cases to which it is applicable. Certainly where suit is brought by a party for the wrongful breaking up and annulling of a contract on which it is claimed large profits would have been realized, it is admissible to show, if it can be clearly made to appear, that it was impossible for the party to have completed the contract had he not have been interfered with, for the purpose of showing that the loss of the profits which would have been realized by the completion of the contract was attributable, in part at least, to his own inability to have fulfilled it, and not altogether to its breach by the other party. The prompt and due execution of the contract may be of the utmost importance, and surely one is not in all cases bound to wait until it is too late to have it

completed within the desired time for the contractor to demonstrate his inability to do this, on peril of paying him all the profits to be realized from a performance as stipulated, if it can be shown beyond question that he was unable to complete it; and especially where the contractor cannot respond in damages for a breach on his part.   But when evidence is offered merely on the hypothesis that although the plaintiff had not violated the contract he evidently would have been unable to complete it, it must be shown beyond all reasonable doubt, in view of all the facts of the case, that the anticipated result must have ensued in the near future if it had not been anticipated by the termination put to the contract.   In view of the facts of this case, was the evidence rejected of such a character as that it should have been admitted on the ground here insisted on ?   We think not.   The contract gave the company full control over the progress of the work, and enabled the company to terminate it certainly in a month's time, if the contractor should for any cause fail to make satisfactory progress with the work.   It is a matter of common observation that contracts of this sort are frequently made with parties whose integrity, energy, and business capacity give the only security for their due and prompt fulfillment, and that these qualities are, indeed, regarded as far better assurance for a compliance with the contract than the mere solvency of the contractor.   Aside from these considerations, it is a sufficient answer to the objection to say that this was not the ground upon which the evidence was offered.   It has been often held, if evidence is not admissible for the purpose for which it is offered, this court will not reverse the judgment if the evidence would have been admissible on some other ground.

The subsequent failure of the sureties in the bond, given when the contract was executed, unquestionably, gave the plaintiff no right to annul it without, at least, affording Shirley the opportunity to substitute other sufficient sureties in their place.

It is shown by the ruling on the exceptions to the evidence, as well as the instructions given to the jury, that the court held, if the company wrongfully declared the contract null and void, and had taken it out of his hands, thereby preventing him from completing it, in addition to his special damages Shirley was entitled to recover the difference between the price stipulated in the contract to be paid for the work, and the actual cost of the work done on the road after the first day of April, 1870, the date when the contract was annulled. The plaintiff in error complains that the proposition set forth by the rulings of the court on this branch of the case is in violation of a well established principle, concurred in as it is insisted both in the English and American courts, that future profits cannot be allowed in estimating the damages whether the action is in the form of contract or tort. (Sedg. Meas. Dam., p. 69.) No doubt abundant authority can be easily found to sustain this general proposition, but while this is so, it is also true that it is the tendency in common law courts to approximate the rule of the civil law, which in general refuses to compensate in damages for the loss of perspective profits. The profits, however, in the case announcing this general rule will most generally be found to be of a collateral or contingent character, or too uncertain and speculative to furnish ground for a reasonable and just compensation. It is certainly as firmly established as the general rule to which we are cited by the plaintiff, that in a certain class of cases future profits are allowed. The distinction in the two classes of cases is well drawn by Chief Justice Nelson in the leading and well considered case of Masterton *v.* The Mayor, &c., of Brooklyn. (7 Hill, 61.) He says: "It is not to be denied that there are profits or gains derivable from a contract which are uniformly rejected as too uncertain and speculative in their nature, and too dependant on the fluctuations of markets, and the chances of business, to enter into a safe or reasonable estimate of damages. Thus, any supposed successful operation the party

might have made, if he had not been prevented from realizing the proceeds of the contract at the time stipulated, is a consideration not to be taken into the estimate; besides the uncertain and contingent issue of such an operation in itself considered, it has no legal or necessary connection with the stipulations between the parties, and cannot therefore be presumed to have entered into their consideration at the time of contracting. It has accordingly been held that the loss on any speculation or enterprise in which a party may have been embarked, relying on the proceeds to be derived from the fulfillment of an existing contract, constitutes no part of the damages to be recovered in case of breach. So a good bargain made by a vendor, in anticipation of the price of the article sold, or an advantageous contract of resale made by a vendee, confiding in the vendor's promise to deliver the article, are considerations always excluded as too remote and contingent to affect the question of damages. * * * Where the books and cases speak of the profits anticipated from a good bargain, as matters too remote and uncertain to be taken into account in ascertaining the measure of damages, they usually have reference to dependant and collateral engagements, entered into on the faith and expectation of the performance of the principal contract.

"But profits or advantages which are the direct and immediate fruits of the contract entered into between the parties, stand upon a different footing. These are part and parcel of the contract itself, entering into and constituting a portion of its very elements, something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, formed perhaps the only inducement to the arrangement."

The distinction drawn in this case, and the general principle laid down in it, that future profits are to be considered in ascertaining the damages sustained for the breach of such

contracts as are here under discussion has been recognized and followed in numerous cases in almost every State of the Union; and, so far as we are aware, without a single dissent.

In the case of Burrell *v.* New York and Saginaw Solar Salt Company, 14 Mich., 34, the rule is directly and forcibly stated: "Where labor is to be performed, from which profit is to spring as the direct result of work done at the contract price, and one party is prevented from earning such profit by the wrongful act of the other, the law will presume that such loss is the direct and natural result of the breach of the contract." (The Philadelphia, Wilmington, and Baltimore Railroad Company *v.* Sebre Howard, 13 How., 307; Gilbert *v.* Kennedy, 22 Mo., 117; Richmond *v.* Dubuque, &c., R. R. Co., 26 Iowa, 191.) In some cases the rule has been extended even further than here stated. (Hale *v.* Frout, 35 Cal., 229, and cases cited.)

We are referred by the plaintiff to several cases from the Supreme Court of Kentucky which, it is insisted, decided the contrary. But an examination shows that this is a mistake. The point decided in these cases is, that a proffer to perform a condition precedent, and a refusal by the other party to accept, will exonerate the party making the tender from liability for non-performance. But the refusal of such an offer will not always entitle the party making it to the same recovery that actual performance would have given; that is, the measure of damages is not the contract price to be paid for the work or labor when performed. This does not negative, but rather goes in support of the rule, that the profits on the contract is the price to be paid, less the expenses of every kind to be incurred in fulfilling it, as held in the case previously cited, furnish the proper measure by which the damages are to be ascertained.

But while we concede the correctness of the proposition announced in the case cited, as well as many others to which we might have referred, that future profits are to be taken into consideration in estimating the damages sustained by a

breach of contract like that in this case, it is necessary, to avoid misconception, to say that the mere statement of the brief formula—that the measure of damages in such cases is the profits or difference in what it would cost to complete the work as stipulated in the contract and the price to be paid—might, if not accompanied by proper explanations and qualifications, mislead, and in some cases result in injustice. It is the purpose of the law to compensate the party injured by damages for the loss which he has sustained by the wrong done him.   In estimating this loss, as the cases cited plainly show, the difference in what it costs to do the work and the price to be paid for it, is to be taken into the estimate, and is no doubt the leading and most important feature from which the amount of such loss is to be ascertained.   But it is not the sole guide or only fact to be considered in doing this.   The contract shows the amount to be paid for the entire work, and the probable cost of completing it may be satisfactorily established by proof of the value of the material, labor, and skill required to do it.   If some of the facts to be considered are not susceptible to direct and positive proof, resort can be had to the opinion and judgment of men who are shown to have information and experience which qualify them to testify as to such matters.

The cause of action accrues immediately on the breach; suit may be· brought at once; witnesses have therefore to estimate the cost of labor and material at that date.   Subsequent fluctuations are not to be taken into account.   (7 Hill, 62.)   And in this particular, the charge of the court seems slightly indefinite or inaccurate.   It may be several years before the contract was to have been completed and payment made.   The contractor is relieved from all anxiety, trouble, and labor about its completion.   It is attended with no further risk on his part.   He has to make no additional outlay, and is entitled to his damages immediately.   These things should be considered.   And, guided by the rule just indicated for ascertaining their value, due allowance should be

made for them in determining the amount of real loss by the breach of contract and the just compensation to be made for it. The rule, that the difference between the cost of doing the work and what was to be paid for it is not to be taken as the literal and absolute standard by which to measure the damages, is fully sanctioned by the Supreme Court of the United States. (United States v. Speed, 8 Wall., 77; see also Seaton v. Second Municipality, 3 La. Ann., 44.)

It remains to be considered whether there was any error in the verdict of the jury and the judgment of the court as to the alleged mistake in the contract, whereby a lien is established in favor of plaintiff below for entire damages adjudged him. It is insisted by the counsel of the defendant in this court, though the point does not appear to have been made below, that he has an equitable lien, by the terms of the contract as it stands, for the whole amount of damages to which he was entitled. In this we in part agree. For the amount found by the verdict to be due, for which it was stipulated that a mortgage should be given, the contract, we admit, has, in equity, the effect of a mortgage. But we cannot agree that it can be held to operate as an equitable lien to any further or greater extent. The stipulation for mortgages at the time, and for such sums as are specially mentioned in the contract, raises an implication that no other or different mortgage or lien was intended to be given. The charge in the amended petition, that, by mistake and oversight in drawing the contract, a clause was omitted, whereby a lien was to have been given to secure him against loss, if there was a breach of the contract by the company, seems to us somewhat inconsistent with the proposition now insisted on, and to urge that the contract as drawn, gives him the same lien as that which was to have been.

If it can be shown that a mortgage was to have been given Shirley for such damages as he might sustain in the event of a breach of contract by the company, and that such stipulation was omitted from the contract by oversight and

mistake, undoubtedly, as between the parties, the mistake may be corrected, and the contract, as in fact made and agreed upon, enforced. It is, however, a well-established elementary principle, that, he "who seeks to rectify an instrument, on the ground of mistake, must be able to prove not only that there has been a mistake, but must be able to show exactly and precisely the form to which the deed ought to be brought, in order that it may be set right according to what was really intended, and must be able to establish, in the clearest and most satisfactory manner, that the alleged intention of the parties to which he desires to make it conformable, continued concurrently to the minds of all parties down to the time of its execution. The evidence must be such as to leave no fair and reasonable doubt upon the mind that the deed does not embody the final intention of the parties." (Kerr on Mort., 421.)

It is quite obvious, we think, that there was a failure of defendant to meet and satisfy almost every one of these essential requisites. The only evidence found in the record having the slightest allusion to the alleged mistake in the contract, is that of Shirley himself, of Speight, the president of the company when the contract was made, and one of his attorneys by whom the original petition was filed, and of Lang, one of his witnesses. Shirley says: "We were several days consulting about the terms of the contract, and drawing up a memorandum of the provisions. We concluded the memorandum of the provisions, and gave it to Messrs. Russel & Hicks, attorneys, to draw the contract. I have not seen it since. * * * The company had nothing to secure me, and we stipulated in the memorandum that I was to have a lien on all the property of the railroad to secure me in my rights under the contract." "Speight," says the statement of facts, "testified as to the drawing of the contract, and what occurred subsequently, as stated by Shirley. His recollection was that it was read over to him and Shirley by the attorney, and that it embraced what was in the memorandum. The

intention was to give Shirley a lien to protect him in his rights." Lang says: "I do not now recollect the construction and understanding of the contract with Shirley by the board. The impression made on my mind was that it was a mortgage on the road to secure Shirley for his work, for I recollect distinctly that I stated to the members of the board, and the engineer, I think, that under that contract the Central Railroad would get our franchise." Certainly, no comment is necessary to show that this testimony, vague, indefinite, and loose, and to some extent contradictory, is altogether insufficient to authorize the making such an addition to the contract as is here sought. Especially as there are stipulations in it to which the language of the witnesses may refer fully as appropriately as to that charged to have been omitted. It is also to be noted that no allusion is made to the alleged omission in the original petition, drawn but recently after the execution of the contract, and signed by Speight as one of Shirley's attorneys, and that it was nearly four years after the bringing of the suit before the amendment was filed in which the mistake in drawing the contract is first set up.

There is, however, another view of the matter which still more conclusively shows that the defendant is not entitled to the relief asked in the amended petition, and, on the facts as they appear in the record, the verdict and judgment cannot be sustained. The authority given Speight to contract for the building of the road was limited by the qualification that any contract made by him should be subject to the ratification and approval of the company. If the memorandum contained the stipulation alleged, there is not the slightest reason to suppose that the company had any knowledge of it. Speight says he "thinks the contract embraces what was in the memorandum." It cannot therefore be supposed that he informed the company that so important a stipulation was omitted. The company had before them, as we must infer, merely the contract as drawn by the attorneys and signed by

Shirley and Speight. This instrument contains all the stipu-lations of the agreement to which it can be said the parties mutually agreed, and is the only contract which was ratified by the board of directors, and, as we must conclude, contains all for which the company is bound. If anything is omitted from it, which by the agreement with Speight should have been, and as Shirley supposed was, inserted in it, this might be sufficient to justify his asking the court to cancel and an-nul the contract. But it certainly does not entitle him to have it corrected, so as to conform to such an agreement or his understanding of it, and then enforce it, as thus corrected, against the company. To do so would be to bind the com-pany for that to which they had never agreed. Shirley was fully aware that Speight had no authority to contract or bind the company without its ratification and approval.

We see no reason why the court might not appoint the sheriff as well as any one else commissioned to carry into effect its judgment foreclosing the mortgage lien. This was the legal effect of the judgment. It is of no consequence that the order of sale is directed to the person to whom the court confides the duty of selling the property by his official title, or even in his official character, instead of that of commis-sioner. It is to the nature and character of the act to be done under the order that we must look, and not to the mere form and style of the order, to determine as to its validity or that of whatever may be done under its authority. Whether the sheriff, under the authority conferred by the order of sale, should apply the money received and execute a convey-ance, unless he is especially ordered to do so in the order, until his report is confirmed, and the application of the one and the execution of the other is ordered by the court, has not here been discussed and need not be considered.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

NOTE.—This case was taken from the Austin Term, and decided at Tyler December 28, 1875.