Burnett **ESTES** et al., Appellants,

v.

**REPUBLIC NATIONAL BANK OF DALLAS, Appellee.**

No. 17370.

Court of Civil Appeals of Texas, Dallas.

Dec. 29, 1969.

Rehearing Denied Jan. 29, 1970.

Elgar L. Robertson, Dallas, for appellants.

B. Thomas McElroy, White, McElroy & White, Dallas, for appellee.

BATEMAN, Justice.

The appellee Bank sued the appellant Burnett Estes on ten promissory notes aggregating approximately $600,000, signed by Estes and payable to appellee, and sought foreclosure of a deed of trust lien on land in Denton County as against both Estes and the appellant Dan Gibbs. At the conclusion of the evidence the court directed a verdict in favor of appellee.*  Appellants' seven points of error on appeal are in two categories. They are so briefed and we shall so dispose of them.

In the first three points of error complaint is made of the refusal of the court to grant appellants additional time to prepare for trial. Estes' first attorney filed for him only a general denial and subsequently withdrew. On April 7, 1969 Estes employed the Hon. Elgar L. Robertson to represent him, and on April 14, 1969 Mr. Robertson filed for him an amended answer alleging *inter alia* that the notes sued on were usurious and also that the deed of trust on the Denton County farm, given to secure a note for $30,000, was by accident and mutual mistake so worded as to make it also secure all other indebtedness of Estes to the Bank, whereas the true agreement was that upon payment of the $30,000 note the lien on said land would be released. On April 21, 1969, when the case was called for trial, the trial court overruled a first application for continuance filed by Estes on the grounds that the case involved unusual complications and voluminous records and that since the employment of Mr. Robertson he had not had sufficient time to prepare. Appellee's first witness, an officer of the Bank, had been served with a subpoena duces tecum to bring to court a great volume of bank records pertaining to its business with Estes over many years. Counsel for Estes requested a short recess in order to examine these records, which was denied. Both rulings are assigned as error.

---

* For our opinion on venue in the same case, see Republic National Bank of Dallas v. Estes, 422 S.W.2d 834 (Tex.Civ.App., Dallas 1967, no writ).

■ The decision in such matters has long been held to lie within the sound discretion of the trial judge. Hernandez v. Heldenfels, 374 S.W.2d 196, 202 (Tex. 1963).

■ Moreover, the record fails to show injury to appellants' cause by these rulings. We have no right or authority to reverse a judgment because of such rulings unless the appellant is able to show that the trial court has abused its discretion and thereby prejudiced appellant's position. There is no showing whatever that if either or both of the requests for additional time had been granted appellants would have been able to develop usury or any other defense more effectively than they did. For the court to allow additional time to a defendant who shows that he has a defense, or even that he probably has one, and needs time to develop that defense, is one thing; but to disrupt the orderly disposition of the docket, or compel the judge, jury and opposing counsel to wait while a lengthy search of records is made in the mere *hope* of discovering a defense, is quite another. The appellants have not discharged their burden either to show abuse of discretion or that the rulings resulted in harm to them. Rule 434, Vernon's Texas Rules of Civil Procedure; Commercial Standard Ins. Co. v. Merit Clothing Co., 377 S.W.2d 179, 181 (Tex.1964). Appellants' first three points of error are accordingly overruled.

Appellants' points of error 4 through 7 assert reversible error in the trial court's rulings which precluded the appellant Estes from showing by his testimony and that of another that because of mutual mistake the deed of trust in question did not express the true agreement between him and the Bank, which was that the lien on the land would be released when the $30,000 note was paid.

The evidence showed that over a period of several years Estes had had extensive financial transactions with the Bank and had given it many promissory notes. Appellee declared upon ten such notes, one of which was for $30,000 secured by the deed of trust in question. This note and deed of trust were dated August 17, 1961. The deed of trust contained what is commonly known as a "Mother Hubbard Clause," as follows:

"This Deed of Trust shall secure, in addition to the said Note, all funds hereafter advanced by Beneficiary to or for the benefit of Grantors, as contemplated *by any covenant or provision herein* contained or for any other purpose, and all other indebtedness, of whatever kind or character, owing or which may hereafter become owing by Grantors to Beneficiary, whether such indebtedness is evidenced by note, open account, overdraft, endorsement, surety agreement, guaranty, or otherwise, it being contemplated that Grantors may hereafter become indebted to Beneficiary in further sum or sums."

The farm was thereafter conveyed by Estes to a corporation and by it to appellant Dan Gibbs. Gibbs tendered payment of the $30,000 note, provided appellee would release the farm, but this was refused. Although the note itself was payable in monthly installments expressly payable on or before maturity, Estes pled, and it was proved, that at his insistence a notation was typewritten in the lower left corner of the note, as follows:

"Maker of this note has the option of paying all of this note or any part thereof, on or before its maturity, without, penalty."

When Estes offered to testify to an agreement at variance with that expressed in the deed of trust, objection thereto was sustained and, according to the bill of exceptions, Estes if permitted would have testified that he had dealt with George Verner at the bank and discussed this note and deed of trust with him, and also as follows:

"A  I told George that I wanted it understood and specific, and I wanted it on the note itself that this was an on or

before note, and when it was paid off, the farm would come clear, because I didn't want this tied up with all the other affairs we had going, and this was—

Q Now, you had considerable affairs going at that time, did you not?

A Very substantial, yes, sir.

Q All right. What did Mr. Verner say?

A Well, he said that it was all right, and we would put this notation on the deed of trust itself, on the note.

Q And did he tell you that that would be effective to make this an isolated transaction?

A Yes, sir, he did. * * *"

Appellants then introduced George M. Verner, who had been a vice-president and loan officer of the Bank in 1961 and who had discussed with Estes the loan of $30,-000 on the Denton County farm, and who then testified:

"Q * * * Now, did you have any conversations with Mr. Estes regarding how he wanted this farm note handled?

A The only conversation I remember is that he wanted to keep his personal business separated from the corporation, the partnership and so forth.

Q In other words, he wanted this to be an isolated transaction from the other—from the other business?

A I wouldn't say isolated, he just wanted a separate ledger; in other words, where it would be easier identified as his personal debt.

Q And he wanted that—do you recall in that conversation any discussion as to whether or not he wanted the collateral for the $30,000 note just to be the farm and nothing else?

A I don't recall.

Q But, you do recall the discussion that he did want to keep it separate?

A That all along in my handling Burnett's business, or Mr. Estes' business in the bank, that was his desire, to have it separated.

*    *    *    *    *    *

Q Now, did you actually prepare the note and deed of trust?

A Are you talking about in August, 1961?

Q Yes.

A No.

Q *Was that under your direction?*

A *I don't—I don't think so. I seem to remember that it was prepared in the mortgage loan department.* Probably I told them to rework it, right.

Q *Well, did you give instructions then to whoever did prepare it as to how it should be prepared?*

A *No specific instructions, no.*

Q But, it was your understanding, though, that it was to be a separate transaction from his business and other dealings with the bank?

A It was a separate note, yes.

Q And it was—was it to be bottomed on its own?

A Well, the collateral was to support that note, yes."

Mr. Verner then testified on cross-examination:

"Q * * * Now, these instruments are correct, are they not, reflecting what the parties did and wanted to do?

A This reflects $30,000 indebtedness, and I would say that this looks like Mr. Estes' signature, right.

Q And where the deed of trust on the—which you have there before you—specifically provides that it will cover all indebtedness that Mr. Estes then owed the bank, or would thereafter owe the bank, you are not saying that that is not what the parties—

A Oh, that is what the deed of trust says, that is correct.

Q And not only is that what it says, but that is what the intention of the parties were, that is what you all were doing?

A That is right.

Q In other words, you have got a deed of trust there on this farm in Denton County, Texas, and it provides that if the $30,000 note isn't paid *or if any other indebtedness of Mr. Estes to the bank isn't paid,* then the deed of trust can be foreclosed and the bank can have its lien on that farm foreclosed, and the bank become the owner of that property?

A *That is correct.*

Q *And obviously, that was the agreement of the parties, wasn't it, because if it had been anything different, there would have to have been some other writing pertaining to that?*

A *That is correct, right, there had to be other writing.*

Q And as a bank officer, there is no way in the world that you would have any authority to modify the standard deed of trust, is there?

A Except in writing.

Q Yes. That was not done?

A Not to my knowledge." (Italics ours.)

On re-direct examination Verner was asked whether, if within a short time after making this note and deed of trust Estes had paid the note off, he would have released that deed of trust. Objection to this question was sustained; and according to the bill of exceptions Verner would have testified as follows:

"Q (By Mr. Robertson) Mr. Verner, in view of the fact of the negotiations and agreement that you had with Mr. Estes, regarding this $30,000 note and the deed of trust on the farm, I will ask you, sir, if Mr. Estes had come in at a subsequent date to that, say, a year after that, and

to you as an officer of the bank, and offered to pay this $30,000 note, would you have released the deed of trust against that farm?

A As an officer of the bank, but not in respect to any negotiations, conversations, if tender had been offered prior to the time that I resigned from the bank, July 31, 1962, *I would have recommended to the President of the bank that payment be accepted.*

Q *And the land be released?*

A *Right."* (Italics ours.)

■ We have carefully considered all of the evidence relied on by appellants in this respect, viewing it in the light most favorable to them and indulging in their favor every intendment reasonably deducible from the evidence. Hull v. Fitz-Gerald, 232 S.W.2d 93 (Tex.Civ.App., Amarillo 1950, affirmed Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256); Jones v. Nafco Oil and Gas, Inc., 380 S.W.2d 570, 574 (Tex. 1964). This examination convinces us that no right of reformation of the deed of trust because of mutual mistake was shown.

■ The "Mother Hubbard Clause" in the deed of trust is clear and unambiguous. It has been said that ordinarily parties to an unambiguous contract will not be permitted to assert successfully that their minds did not meet on the agreement signed by them. On the contrary, even though the parties may actually have had something else in mind, they will still be held to be responsible for what they have inserted in their signed agreement. 13 Tex.Jur.2d, Contracts, § 256, p. 481, citing Wheeler v. Holloway, 276 S.W. 653 (Tex. Comm'nApp.1925, jdgmt adopted), and Spain v. Fuston, 242 S.W.2d 892 (Tex. Civ.App., Fort Worth 1951, no writ). All previous negotiations leading up to the execution of a written contract are considered merged into the contract. Eldora Oil Co. v. Thompson, 244 S.W. 505, 508 (Tex.Comm'nApp.1922, jdgmt adopted and holding approved).

It is also held that if one knows the contents and legal effect of the language used in an instrument at the time he executes it, he will not be entitled to relief on the ground of mistake because the agreement does not accurately express his intentions. His failure to see that the words in his contract express his intentions constitutes such negligence as will bar his right to reform it. 13 Tex.Jur.2d, Contracts, § 258, p. 483. In the case at bar, although Estes does not contend that he was in any manner or by any means prevented from reading and fully understanding the deed of trust when he signed it, he complains for the first time, nearly eight years later, that it is contrary to the true agreement.

Estes' testimony was sufficient, we think, to establish prima facie that he informed the bank officer with whom he was dealing that he wanted the papers so drawn as to accomplish two things: (1) that he should have the right to pay the debt on or before maturity, and (2) that the transaction with respect to the Denton County farm should be so "isolated" from his other dealings with the bank that the $30,000 could be paid and the deed of trust lien released even though he might still be indebted to the bank for other loans. The evidence fails to show, however, that the bank officer agreed to do more than have the papers so drawn as to accomplish the first objective, i. e., to make the obligation payable on or before maturity. There was no evidence, or certainly no more than a scintilla of evidence, to show that the parties mutually agreed as to the second objective of Estes.

But even if they had so agreed appellants' evidence would have fallen short of establishing a right to reform the contract, or to avoid the plain, unambiguous provisions thereof, on the ground of mutual mistake, for appellants were still under the additional burden of proving that the failure of the written contract to reflect the true oral agreement was due to fraud, accident or mutual mistake. Here the evidence offers no explanation of the failure of the writing to conform to the alleged prior oral agreement. A mere showing that the intention of the parties was different from that expressed in the written contract is not sufficient to avoid the plain terms and provisions of the contract on a plea of mutual mistake. Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d 447, 451 (1935); Hayman v. Dowda, 233 S.W.2d 466 (Tex.Civ. App., Fort Worth 1950, no writ); Bryan v. Dallas Nat. Bank, 135 S.W.2d 249, 252 (Tex.Civ.App., Dallas 1939, writ dism'd jdgmt cor.).

As said in Sun Oil Co. v. Bennett, supra:

"What the parties mutually intended and agreed is not the vital inquiry. The party seeking reformation must of course prove what the true agreement was, but his case is not made by proof that there was an agreement which is at variance with the writing. He must go further and establish the fact that the terms or provisions of the writing which differ from the true agreement made were placed in the instrument by mutual mistake."

See also Davis v. Davis, 141 Tex. 613, 175 S.W.2d 226, 230 (1943); Rogers v. Rogers, 15 S.W.2d 1037, 1039 (Tex.Comm'n App.1929, holding approved); and Clemmens v. Kennedy, 68 S.W.2d 321, 324 (Tex. Civ.App., Texarkana 1934, writ ref'd), wherein the following was quoted with approval from Waco Tap R. R. Co. v. Shirley, 45 Tex. 355, 377 (1876):

"It is, however, a well-established elementary principle, that, he 'who seeks to rectify an instrument, on the ground of mistake, must be able to prove not only that there has been a mistake, but must be able to show exactly and precisely the form to which the deed ought to be brought, in order that it may be set right according to what was really intended, and must be able to establish, in the clearest and most satisfactory manner, that the alleged intention of the

parties to which he desires to make it conformable, continued concurrently to the minds of all parties *down to the time of its execution.* The evidence must be such as to leave no fair and reasonable doubt upon the mind that the deed does not embody *the final intention of the parties.'"* (Italics ours.)

■ The record before us contains no showing as to how much time elapsed between the time of Estes' conversation with Verner and the actual preparation of the note and deed of trust. We cannot assume that the alleged intention of the parties to which appellants desire to make the deed of trust conformable, "continued concurrently to the minds of all parties down to the time of its execution." The burden was upon appellants to make such a showing, and in our opinion they failed to carry that burden.

For these reasons we overrule appellants' points of error 4 through 7.

The judgment appealed from is affirmed.

Affirmed.