## PECOS & N. T. RY. CO. v. MEYER.†

(Court of Civil Appeals of Texas. Amarillo. Feb. 15, 1913. Rehearing Denied March 15, 1913.)

1. CARRIERS (§ 76*) — BILLS OF LADING — "LAWFUL HOLDERS" — CARMACK AMENDMENT.

Under the Carmack Amendment (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 595 [U. S. Comp. St. Supp. 1911, p. 1307]), which provides that any common carrier, receiving property for transportation from a point in one state to a point in another state, shall issue a receipt or bill of lading and shall be liable to the "lawful holder" thereof for any loss or injury to such property caused by it or by any carrier to which such property may be delivered or over whose line such property may pass, the term "lawful holder" comprehends the owner of the property transported or the one beneficially entitled to recover for the loss or injury, and manual possession of the bill of lading is not a prerequisite to the right to sue, so that a shipper accompanying the shipment was not deprived of his right to sue because he surrendered his bills of lading at the destination in exchange for free transportation on the return.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 256–271, 363; Dec. Dig. § 76.*

For other definitions, see Words and Phrases, vol. 5, p. 4029.]

2. CARRIERS (§ 184*)—INJURY TO SHIPMENT —PLEADING—CARMACK AMENDMENT.

The effect of the Carmack Amendment (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 595 [U. S. Comp. St. Supp. 1911, p. 1307]), is to make all connecting carriers the agents of the initial carrier, and in an action thereunder against the initial carrier for injury to a shipment it was not necessary that the petition give the names of defendant's connecting lines.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 832–834; Dec. Dig. § 184.*]

3. CARRIERS (§ 230*) — LIVE STOCK — INJURY TO SHIPMENT—INSTRUCTIONS.

In an action for injuries to a shipment of cattle, instruction that if defendant's servants, at a place where said cattle were unloaded to feed and rest, negligently and carelessly permitted such quantity of salt to be placed in the

---

feeding pens that the cattle, or part, became sick and some died from eating said salt, defendant was liable, but that if the salt, if any, was not placed there by defendant's servants and its presence not known to them, and could not have been discovered by them by the exercise of ordinary care, defendant was not liable, was proper and sufficient.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 961, 962; Dec. Dig. § 230.*]

**4. Trial (§ 260*)—Requested Instructions Covered by Those Given.**

A further instruction, requested by the defendant, that if the shipper accompanied the stock the carrier was not an insurer against loss from inadequacy of the feeding pens or other facilities, and that if, when the cattle were unloaded, there was salt in one of the troughs and plaintiff's cattle ate· thereof and some were injured, yet unless the carrier's employés in charge of the stockyards knew, or by reasonable diligence would have known, that the salt was there, and unless it was negligence on the carrier's part to permit salt to be in the trough, the carrier was not liable, and that if a person reasonably prudent, under the circumstances, would have left such salt in the trough without apprehending injury to the cattle, the carrier would not be liable, differed so slightly from the charge given that its refusal was not harmful.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

**5. Carriers (§ 177*)—Interstate Shipment —Injury to Goods—Effect of Carmack Amendment—Liability for Loss.**

The Carmack Amendment (Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 595 [U. S. Comp. St. Supp. 1911, p. 1307]) providing that a carrier receiving property for transportation from a point in one state to a point in another shall be liable to the lawful holder of the bill of lading for any loss or injury caused by it or by any common carrier to which such property may be delivered or over whose line it may pass, notwithstanding any contract or regulation to the contrary, does not render the initial carrier liable for loss irrespective of negligence, but Congress intended to give a shipper over connecting lines a direct remedy for damages and place on the carriers the burden of locating the particular company guilty of the wrong, and to annul the stipulation, usual in bills of lading, limiting liability of successive connecting carriers to damages resulting on their own lines.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. § 177.*]

**6. Carriers (§ 228*)—Injury to Live Stock —Sufficiency of Evidence.**

A verdict for damages for injury to live stock *held* not without evidence to support it as to unreasonable delay in handling the shipment and negligence in furnishing impure food and water.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 957–960; Dec. Dig. § 228.*]

**7. Trial (§ 250*)—Instructions—Issues.**

It is proper to refuse an instruction on a question conceded both by pleadings and evidence on the trial.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 584–586; Dec. Dig. § 250.*]

**8. Trial (§ 194*)—Instructions—Weight of the Evidence.**

An instruction that a carrier was not liable for delays at any point unless at a certain one specified, and that before defendant could be held liable for delay there the jury must believe that the cattle were damaged by such de-

lay, was on the weight of the evidence on a disputed issue; the testimony of a conductor showing a delay of nearly an hour at a point other than that mentioned and a further delay in reloading at a feeding point.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

**9. Courts (§ 489*) — Conflicting Jurisdiction—United States and State Courts.**

Causes arising under the Carmack Amendment (Act June 29, 1906, c. 3591, § 7, pars. 11, 12 [U. S. Comp. St. Supp. 1911, p. 1307]), relating to interstate commerce, are cognizable by state courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1324–1330, 1333–1341, 1372–1374; Dec. Dig. § 489.*]

**10. Evidence (§ 539½*)—Expert Evidence —Time of a Railroad Run.**

The court did not err in permitting testimony by a shipper that he had had shipments before and knew what a good ordinary run was from a point in Texas to Kansas City; that it was 33 to 34 hours; that he had shipped cattle before over the same line to Kansas City when there were no delays in stock trains.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2350–2352; Dec. Dig. § 539½.*]

**11. Evidence (§ 543½*)—Expert Testimony —Damages to Cattle—Shrinkage.**

An experienced cattle man, familiar with the condition of his cattle when shipped and when delivered and knowing the market prices at destination, was qualified to· testify that the stale appearance of the cattle on account of their being shrunken and looking badly reduced the price 55 to 60 cents per hundred.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2359; Dec. Dig. § 543½.*]

**12. Appeal and Error (§ 1050*)—Harmless Error—Admission of Evidence.**

Any error in permitting a cattle man to testify that the stale appearance of his cattle from being shrunken reduced the price 55 to 60 cents per hundred was harmless, where the plaintiff testified that he was present when the cattle were weighed and made a memorandum of the weights, which the weigher verified, and there was other competent evidence establishing the amount of the shrinkage and weight of the cattle.

[Ed. Note.—For· other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

**13. Carriers (§ 230*)—Injury to Live Stock —Instructions.**

Instruction that a carrier must furnish reasonable and proper facilities and opportunities for feeding and resting live stock in course of transportation, and if necessary unload them for that purpose, was not improper as placing on a carrier the absolute duty of furnishing such facilities and the absolute duty of supplying the stock with proper food, while the evidence showed that the shipper with two assistants·accompanied the stock for the purpose of caring for them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 961, 962; Dec. Dig. § 230.*]

Appeal from District Court, Randall County; Jno. W. Veale, Special Judge.

Action by Peter Meyer against the Pecos & Northern Texas Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Madden, Trulove & Kimbrough, of Amarillo, and Terry, Cavin & Mills, of Galveston, for appellant. Reeder & Dooley, of Amarillo, for appellee.

HALL, J. This is an action by appellee for damages, growing out of the shipment of live stock from Happy, Tex., to Kansas City, Mo. Appellee alleged, in substance, that on August 20, 1910, the defendant railway company received from plaintiff for transportation from Happy, Tex., by it and its connecting carriers, to Kansas City, Mo., about 235 beef cattle, for which defendant issued three receipts or bills of lading, one in the name of E. F. Brown, one in the name of appellee, and the other in the name of J. F. Meyer; that, at the time said cattle were so received and said bills of lading so issued, defendant well knew that all of the cattle were the property of the plaintiff; that, if the defendant and its connecting carriers had properly and expeditiously transported said cattle, they would have arrived in Kansas City in time to have been sold on the market on August 22, 1910; that, instead of properly and expeditiously transporting, handling, and caring for said cattle, the defendant and its connecting carriers delayed said cattle at Augusta, Kan., and at Emporia, Kan., and at various other points along the route unknown to plaintiff; that, in addition to the delays mentioned, the cattle were roughly handled en route; that when they were unloaded at Emporia they were in reasonably fair condition; but that they were there fed and watered in pens that were not properly kept for the purpose for which they were used, particularly in that there was a large quantity of salt in said pens to which the cattle had access and of which they ate; and that rotten hay was given them as feed and impure water was furnished for drinking purposes. Appellee then alleged the failure of the cattle to reach the market in time to be sold on August 22d, and that, as a result of the delays and rough handling, the cattle were damaged in the aggregate sum of $1,950. This action is evidently brought under what is known as the Carmack Amendment (Fed. Stat. Annot. Supp. 1909, pp. 273–274; 34 Stat. 594), which provides that: "Any common carrier, railroad or transportation company, receiving property for transportation from a point in one state to a point in another state, shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property, caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed; provided that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." The act further provides that the railroad issuing such bill of lading shall be entitled to recover from its connecting carrier, on whose line or lines damage or injury shall have been sustained, the amount thereof, as it may be required to pay to the owners of the property.

[1] Appellee alleged in his petition that all three of the bills of lading had been delivered to the defendant and its connecting carriers and agents, and that he was not able to produce either the originals or copies thereof. The evidence shows that the bills of lading were surrendered at the point of destination to the Atchison, Topeka & Santa Fé Railway Company, and in exchange therefor appellee and his agents, J. F. Meyer and E. F. Brown, who with him accompanied the shipment in question, received free transportation, known as "drovers' passes," from Kansas City to Happy, Tex. This being the state of the record, appellant, under the first, second, third, fifth, sixth, and seventh assignments, insists that the court should have sustained a demurrer to the petition or else should have instructed the jury peremptorily in its favor, because of suit having been brought by one whose pleading and evidence showed him not to be the "lawful holder" of the bills of lading. This is not a suit to recover a penalty. As was said by the Supreme Court of the United States, after discussing the plight of shippers under the old rule: "The shipper was not himself in possession of the information as to when and where his property had been lost or damaged and had no access to the records of the connecting carrier, who in turn had participated in some part of the transportation. He was compelled in many instances to make such settlement as should be proposed. This burdensome situation of the shipping public in reference to interstate shipments over routes including separate lines of carriers was the matter which Congress undertook to regulate." Atlantic C. L. R. Co. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7. It is established law that a common carrier is not permitted by contract to limit its liability for negligence. If appellant's contention, under these assignments, is sound, then shippers who accompany their cattle in transit, as caretakers, in consideration of free transportation to and from market, could be forced by contract to surrender their right of action for negligence by that part of the contract which requires them to surrender the bills of lading in consideration of a drover's pass back to the initial station. In other words, the carrier could say: "I will transport your cattle at tariff rate; will also give you free transportation to and from market, but before you can return free you

must surrender your bills of lading and cease to be the 'lawful holder' thereof." And it could thus deprive the shipper, under the terms of the contract, of his right to recover damages for the negligence of the carrier and its connecting carriers. This would enable the carrier, by an indirect method, to limit by contract its liability for negligence. We are not willing to place this construction upon the act in question. In our opinion, the term "lawful holder," as used in the act, comprehends the owner of the property transported, or the one beneficially entitled to recover for the loss or injury, and we hold that manual possession of the bill of lading is not a prerequisite to the right to sue. These assignments are overruled.

[2] The fourth assignment of error complains that the court erred in overruling defendant's special exception to the effect that the petition failed to give the names of defendant's connecting lines over which the cattle were transported. Under the Carmack Amendment, this is a matter of no importance to plaintiff, since he is required to allege the name of the initial carrier only. Nor do we think that it was particularly prejudicial to appellant that appellee failed to allege the names of the connecting carriers. The effect of the Carmack Amendment is to make all such connecting carriers the agents of the initial carrier, and appellant may safely be presumed to know the name of its agents.

[3, 4] The eighth, tenth, and eleventh assignments will be considered together. The eighth assignment complains that the court erred in its charge in authorizing the jury to base a verdict against the defendant upon the alleged consumption of salt by the cattle at Emporia, Kan., because the proof shows that salt is an article of common use for cattle and that the employés of the stockyards at Emporia were frequently called upon by shippers of cattle to furnish them salt; that there is no testimony showing that defendant had any notice of anything connected with the previous history or the condition of the cattle which would in any wise make it dangerous to let them have salt, and salt being presumptively beneficial to cattle, in the absence of testimony showing that the railroad company or the stockyards employés had some peculiar knowledge or notice of some circumstance, making it dangerous to permit the cattle to lick the salt, no negligence could be attributed to the railroad company by reason of the salt being in the pens. One witness testified for appellee that it was not ordinarily dangerous to let cattle have salt where they can get salt and grass and water all along together; but, where they have been kept off of salt too long and they get to the two together, it is dangerous. A number of witnesses testified to the contrary. The portion of the charge

complained of by appellant is as follows: "And in this connection, you are further charged if you find and believe from the testimony that the agents, servants, and employés of the Atchison, Topeka & Santa Fé Railway Company at Emporia, Kan., where said cattle were unloaded to water, feed, and rest them, negligently and carelessly permitted such quantity of salt to be placed in one of the feeding troughs in one of its feeding pens, at Emporia, Kan., into which pen plaintiff's cattle or a part thereof were placed, and you further believe that plaintiff's cattle or any part thereof became sick and some of them died from eating said salt, then and in that case defendant became liable and bound to pay plaintiff for such injuries and damages, if any, he suffered by reason thereof. However, the presence of said salt in said lot, if any there was, was not placed there by any of the servants, agents, or employés of said Atchison, Topeka & Santa Fé Railway Company, and its presence therein was not known to the agents, servants, or employés of said Atchison, Topeka & Santa Fé Railway Company, and could not have been discovered by such agents, servants, and employés, by the exercise of ordinary care, then and in that case the defendant would not be liable to plaintiff for any injury or damage, if any, plaintiff's cattle may have suffered by eating such salt."

The tenth assignment complains of the court's refusal to give defendant's special charge No. 6, as follows: "You are instructed that in a case of this kind, where the shipper and other persons selected by him for his assistants are permitted to and do accompany a shipment of cattle, the carrier does not become an insurer of the cattle against loss, damage, or delays, and does not become an insurer of the safety or adequacy of the feeding pens or other facilities it may provide for the handling and caring for said cattle en route, but the measure of its duty is to exercise ordinary care—that is, such care as a reasonably prudent person would exercise under the same or similar circumstances—to provide facilities that are reasonably safe. If, therefore, you believe from the evidence that when plaintiff's cattle were unloaded in the stock pens at Emporia, Kan., there was salt in one of the troughs in one of the feeding pens, and that plaintiff's cattle, or some of them, ate of said salt and were injured thereby, yet, unless you further believe that the railroad company or its employés in charge of said stockyards knew, or by the exercise of reasonable diligence would have known, that said salt was in said trough, and unless you further believe from the evidence that it was negligence on the part of said railroad company or said stockyards' employés to permit said salt to be in said trough, so that the plaintiff's cattle could eat thereof,

then the plaintiff cannot be held liable for any damage, if any, which you may believe from a preponderance of the testimony to have resulted to plaintiff's cattle from eating of said salt; and, in this connection, you are charged further that if you believe from the testimony that a person reasonably prudent, under the circumstances, would have left whatever quantity of salt, if any, you find was left in said trough, at the time plaintiff's cattle were placed in said feeding pens, without apprehending or expecting that any injury would result to the plaintiff's cattle from leaving said salt in said trough, then the defendant would not be liable to the plaintiff for any injury which may have resulted to said cattle, if any resulted, from eating said salt." A comparison of the special charge refused and of the general charge given by the court upon this issue discloses such a slight difference between the two that in our opinion no injury could have resulted to appellant by reason of the court's action. We think the charge as given was sufficient upon this question.

[5] It is contended by appellee that the Carmack Amendment (34 U. S. Stat. 594; U. S. Comp. Stat. Supp. 1909, p. 1166; Fed. Stat. Ann. Supp. 1909, pp. 273, 274) has the effect of rendering the initial carrier in interstate shipments over more than one line liable for any loss, damage, or injury caused by it or any connecting carrier, irrespective of any question of negligence, and, in support of his contention, we are cited to L. & N. R. R. Co. v. Warfield, 6 Ga. App. 550, 65 S. E. 308, and S. L. S. W. R. R. Co. v. Ray, 127 S. W. 281. The language of the amendment applicable hereto is: "That any common carrier, railroad or transportation company, receiving property for transportation from a point in one state to a point in another state, shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property, caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed." In the case last above mentioned, Hodges, Justice, speaking for the court, held that liability for damage "caused" by the carrier should be determined without reference to whether it resulted from the negligence of the carrier, provided the carrier is responsible for the agency, by reason of which the loss or injury occurs, and adds: "To say that the provision of the statute quoted refers to damage caused by the *negligence* of the carrier would be to charge Congress with having done much that was wholly unnecessary in an effort to prevent a limitation upon the

liabilities of carriers. It did not require the aid of a statute to prevent carriers from contracting for immunity from damage resulting from their negligence. Had Congress intended in this amendatory legislation to confine the liability of one carrier for the damage caused by another in case of a through shipment to that which results from negligence, its meaning could easily have been made plain. In view of the common-law liability of carriers, which can only be escaped by contract and the fact that this provision is intended as a limitation upon the power to so contract for such immunity, the absence of any qualifying term, restraining the language of the inhibitory provision to causes resulting from negligence, is significant as indicating that no such intention existed in the minds of the lawmakers."

The common-law liability referred to by the writer of the above-quoted opinion is defined by Elliott on Railroads (2d Ed.) sec. 1454, as follows: "A common law imposes very onerous duties upon carriers and holds them to very strict accountability. These rules prevail except where they have been changed or abrogated by statute. By the common law, carriers are bailees for hire, but their liability is much greater than those of ordinary bailees for hire or reward. The liability of common carriers of goods is an extraordinary one and does not depend upon the question of negligence or no negligence, for they may be liable for the loss of goods or for injury to them, although there has been on their part no neglect. They are in effect insurers of the goods intrusted to them for transportation, and, according to the common-law rule, can escape liability only upon some one of the following grounds, viz., that the loss or injury was caused by the act of God or by the act of the public enemy. The modern rule is more liberal, for to the old common-law grounds which will exonerate the carrier from liability have been added the following, viz., acts of the public authorities and loss or injury attributable to the inherent nature of the goods. It is sometimes said that another ground has been added by the modern law, viz., that arising from the acts of the shipper; but we think there never was a time when the carrier could be held liable where the loss was caused by the wrong or fault of the shipper."

We are not inclined to follow the holding of Justice Hodges in the Ray Case to the extent announced by the writer of that opinion. It will be observed that the federal statute above quoted further provides that: "Nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law. That the common carrier, railroad or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common car-

rier, railroad or transportation company on whose line the loss, damage or injury shall have been sustained, the amount of such loss, damage or injury as it may be required to pay to the owners of such property," etc. Our construction of the language quoted, when considered together, is that Congress intended to give a shipper in interstate shipments, where his property was transported over several lines, a direct and ready remedy for the collection of his damages, and places upon the carriers the burden of .locating the particular company guilty of the wrong, and to set aside the presumption that the injury resulted from the act of the last carrier. We think it was further intended to annul the stipulation, almost universally found in bills of lading, which limited the liability of each successive connecting carrier to damages resulting upon.its own line, and in all cases, even where the shipper accompanied the shipment, to throw the burden of exonerating itself from liability upon the carrier. In other words, the effect of the act is to re-establish the common-law rule that when freight is delivered to a carrier in good condition and reaches its destination in bad condition, or fails to reach its destination at all, the presumption of negligence arises; the rule, however, modified by the right of each carrier handling the freight to relieve itself of liability by proof showing an absence of negligence on its part, and further proof tending to detect the guilty carrier. It seems to us that to hold with the Ray Case that the question of negligence or no negligence is not an issue under the Carmack Amendment would deprive the connecting carriers of rights inter se. What is here said disposes of the eighth, tenth, and eleventh assignments.

[6] Under the ninth assignment contention is made that the verdict is contrary to the weight of the evidence and without evidence to support it, in that there was no unreasonable delay on the part of the carriers handling the shipment of cattle and no negligence on the part of said carriers or any of them causing the cattle to be fed on salt, impure water, or damaged or rotten hay at Emporia, Kan., and no evidence, in fact, showing how the cattle were injured by the water, hay, or salt. This assignment cannot be sustained because there is evidence in the record to the effect that salt is injurious to cattle under the conditions surrounding this shipment and that the troughs in the particular pen where the cattle, which subsequently died, were confined, contained moulded or rotten alfalfa. Appellee testified: "I did not think the water the best. The water smelled off as it came out of the hydrant." We are not prepared to say what particular odor "off" is, and whether or not such an odor indicated impurity. That was a question for the jury, and they have settled it, together with the effect of the salt and the hay upon

the cattle, adversely to appellant's contention.

The twelfth assignment insists that the court erred in refusing defendant's special charge No. 5. Reference to the general charge shows that the substance of special charge No. 5 was embodied in the third paragraph of the general charge.

[7] The thirteenth assignment complains of the court's refusal to give defendant's special charge No. 9, upon the question of delay between Happy, Tex., and Augusta, Kan. It seems to have been conceded upon the trial, both by the pleadings and evidence of appellee, that there was no delay between these two points, and there was no necessity for such a charge, since there was no such issue for the jury to consider.

[8] The fourteenth and fifteenth assignments are based upon the court's refusal to give special charge No. 10, to the effect that the defendant could not be held liable for delays at any point unless it should be at Augusta, Kan., and that before defendant could be held liable for delay at Augusta the jury must believe that the cattle were damaged by such delay. This charge was upon the weight of the evidence and upon a disputed issue. The testimony of one of the conductors showed a delay of nearly an hour at a point other than Augusta, and a further delay at Emporia, after the cattle were reloaded.

[9] The sixteenth assignment is without merit. The Supreme Court of the United States, as well as the Supreme Court of Texas, have heretofore held that causes arising under the Carmack Amendment are cognizable by state courts. G., H. & S. A. Ry. Co. v. Wallace, 223 U. S. 481, 32 Sup. Ct. 205, 56 L. Ed. 516; H. & T. C. Ry. Co. v. Lewis, 103 Tex. 452, 129 S. W. 594.

[10] The seventeenth assignment complains of the court permitting appellee, to testify as to the length of time required to make the run from Happy, Tex., to Kansas City, Mo. Appellee testified: "I have had shipments before, and know what a good, ordinary run is from Happy to Kansas City. It is 33 to 34 hours. I have shipped cattle before over the same line to Kansas City, when there .were no delays in stock trains. We did not have a train load of cattle from the starting point." The court did not err in permitting this testimony. P. & N. T. Ry. Co. v. Gray, 145 S. W. 728; A., T. & S. F. Ry. Co. v. Davidson, 127 S. W. 895; St. L., etc., Ry. Co. v. Gunter, 99 S. W. 152.

[11, 12] The eighteenth assignment complains of the action of the court in permitting appellee to testify in his own behalf that the stale appearance of the cattle on account of their being shrunken and looking badly reduced the price 55 to 60 cents per hundred. The record shows that the witness was an experienced cattle man, was familiar with the condition of his cattle when shipped

and when delivered at destination, knew the market prices at destination, and we think therefore was qualified to testify as he was permitted. M., K. & T. Ry. Co. v. Woods, 31 S. W. 237; St. Louis, etc., Ry. Co. v. Boshear, 108 S. W. 1032; s. c., 102 Tex. 76, 113 S. W. 6; F. W. & D. C. Ry. Co. v. Richards, 105 S. W. 236. The appellant testified that he was present when the cattle were weighed and helped to weigh them; that he made a memorandum of the weights, which the weigher verified, and he knew his memorandum was correct. There was other competent evidence establishing the amount of the shrinkage and weight of the cattle, and no injury has resulted from the court's action in this particular. St. L., etc., Ry. Co. v. Wills, 102 S. W. 733; St. Louis, etc., Ry. Co. v. Smith, 53 Tex. Civ. App. 42, 115 S. W. 882.

The twentieth assignment, insisting that the verdict is excessive, is without merit. There is sufficient evidence in the record to sustain the verdict for the full amount.

[13] By the twenty-first assignment of error, appellant insists that the court erred in the fourth paragraph of the charge to the jury, which is as follows: "A railroad company transporting live stock must furnish reasonable and proper facilities and opportunities for feeding, watering, and resting the live stock in its care or while in course of transportation and supply them with proper food, water, and rest, along the route, and, if necessary, unload them for that purpose" —because such charge placed upon appellant the absolute duty of furnishing said facilities and opportunities and the absolute duty of supplying the stock with proper food and water, whereas the evidence showed that the plaintiff, with two assistants, accompanied the stock for the purpose of caring for them; and in such case the company was liable only in the event it should fail to exercise ordinary care in such particulars. In our opinion, there was no error in this charge, and the very point has been settled by repeated decisions in this state against appellant's contention. When considered in connection with the remainder of the charge, wherein the court submits special issues concerning the furnishing of improper food and water, the liability of appellant was expressly conditioned upon the negligence of the carrier in that regard. Mo., etc., Ry. Co. v. Pullen, 90 Ark. 182, 118 S. W. 702; T. & B. V. Ry. Co. v. Crawford, 146 S. W. 329; S. A. & A. P. Ry. Co. v. Martin, 49 Tex. Civ. App. 197, 108 S. W. 981; M., K. & T. Ry. Co. v. Stanfield, 40 Tex. Civ. App. 385, 90 S. W. 517.

The contention under the twenty-second assignment has already been disposed of. It is also overruled.

The twenty-third assignment is disposed of by what has been said heretofore in disposing of the first, second, third, fifth, sixth, and seventh assignments.

The twenty-fourth assignment is without merit, as heretofore held in disposing of the twelfth assignment.

Finding no reversible error in the record, the judgment is affirmed.