## CITY NAT. BANK OF EL PASO v. EL PASO & N. E. RY. CO. et al. (No. 1116.)

(Court of Civil Appeals of Texas. El Paso. Oct. 28, 1920. Rehearing Denied Dec. 2, 1920.)

1. **Carriers** ⊚⟹212—**Delivery to third person in whose care stock was consigned is delivery to consignee.**

Where a shipment of cattle was filled by the shipper's directions to a consignee in care of a third person, delivery by the carrier to the third person is equivalent to delivery to the consignee.

2. **Judgment** ⊚⟹18(1)—**Evidence as to issues not pleaded will not support judgment.**

Evidence admitted at the trial, however it may have been adduced, will not support a judgment if there was no pleading to support the evidence.

3. **Reformation of instruments** ⊚⟹25—**Fact of "mistake" does not show negligence which bars remedy.**

The mere fact that a mistake was made in an instrument does not show such negligence as to bar the right of reformation, though the term "mistake" carries with it the idea of fault.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Mistake.]

4. **Reformation of instruments** ⊚⟹24—**Bill of lading can be reformed after delivery of stock to intended consignee.**

Where, through mutual mistake of the shipper's agent and the carrier, the direction as to the person in whose care the consignee could be reached was omitted from the bill of lading, the carrier can have the bill of lading reformed after delivering the stock to that third person, notwithstanding the shipper's objection that the carrier could not put it in statu quo.

5. **Trial** ⊚⟹350(4)—**Issue as to reliance on mistake in bill of lading held immaterial.**

Where it appeared from other findings supported by the evidence that the shipper's agent directed delivery to the consignee in care of a third person but such direction was omitted from the bill of lading through mutual mistake, an issue requested by the shipper as to whether it relied on the bill of lading as expressing the true contract was not controlling, so that it was not reversible error to refuse to submit it to the jury.

6. **Reformation of instruments** ⊚⟹44 — **Evidence of custom held admissible to corroborate evidence of mistake.**

Where the carrier sought reformation of a bill of lading on the ground of mutual mistake to make the bill of lading to conform to the waybill, evidence of a general custom to handle such shipments on the waybill was admissible to show that the cattle were handled in the manner intended by the shipper's agent in giving directions for the billing and in corroboration of the contention of the carrier as to the mistake.

7. **Appeal and error** ⊚⟹1052(5) — **Admission of immaterial custom held not prejudicial in view of determination.**

Erroneous admission of evidence of a custom to handle shipments of cattle according to directions in the waybill does not require a reversal of a judgment for the carrier, where the jury found on sufficient evidence that the shipper's agent directed delivery in the manner stated in the waybill but that such direction was omitted by mutual mistake from the bill of lading.

### On Rehearing.

8. **Carriers** ⊚⟹83—**Carmack Amendment does not forbid any delivery without bill of lading.**

The Carmack Amendment of June 29, 1906, to the Hepburn Act (U. S. Comp. St. §§ 8604a, 8604aa), requiring initial carrier to deliver a bill of lading and rendering it liable to the holder through any loss or damage, was not intended to forbid the delivery of a shipment by carrier under any circumstances to any one except the holder of the bill of lading.

9. **Judgment** ⊚⟹250—**Petition for nondelivery to consignee does not support recovery for delivery without surrender of bill of lading.**

A petition, alleging that the carrier failed to deliver the cattle shipped to the consignee or to the consignor, does not support recovery by the shipper for the carrier's delivery to the person in whose care the consignee was to be reached without requiring the surrender of the

⊚⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

bill of lading, even though the latter cause of action was supported by the evidence.

**10. Principal and agent ⬅⟹101(2) — Agent to ship stock has implied authority to direct delivery.**

Where a bank intrusted to an agent the duty of shipping its cattle and that agent alone dealt with the carrier, the agent had implied authority to give directions as to the person to whom delivery of the stock should be made, and the carrier is not affected by any secret limitation on his authority in that respect, especially where prior shipments had been made by the same agent with similar directions for delivery and the bank had made no objection thereto.

**11. Reformation of instruments ⬅⟹45(2) — Evidence held to sustain finding of mutual mistake as to delivery directions in bill of lading.**

Evidence by the agents of both the shipper and the carrier that the shipper's agent directed a shipment of cattle to be billed to a bank in care of a commission company, and that the agent gave such direction so that the commission company might secure possession without waiting for the bank to open and thereby save a market day, *held* to show that it was a mutual mistake of the parties that the bill of lading failed to include the direction as to the care of the commission company so that the carrier could have it reformed in that respect.

**12. Carriers ⬅⟹30—Carmack Amendment prohibits oral contracts contrary to schedules.**

The Carmack Amendment (U. S. Comp. St. §§ 8604a, 8604aa) prohibits the making of new oral agreements between the shipper and the carrier which are contrary to the schedules or tariffs on file with the Interstate Commerce Commission.

**13. Evidence ⬅⟹433(6)—Carmack Amendment does not exclude parol proof of mutual mistake in bill of lading.**

The Carmack Amendment (U. S. Comp. St. §§ 8604a, 8604aa), requiring the issuance of a bill of lading, does not exclude parol evidence of a mutual mistake in the bill of lading.

**14. Trial ⬅⟹352(1)—Special issue as to mutual mistake should be submitted in ordinary form.**

Though a mistake by the parties to the written contract must be established with reasonable certainty to entitle either to a reformation of the contract, it is proper to submit to the jury a special issue as to such mistake in the ordinary form and with the ordinary tests, and affirmative answer to such issues establishes the mistake.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by the City National Bank of El Paso, Tex., against the El Paso & Northeastern Railway Company and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Dyer, Croom & Jones, of El Paso, for appellant.

W. M. Peticolas and Del W. Harrington, both of El Paso, for appellees.

HIGGINS, J. The City National Bank of El Paso, Tex., appellant, brought this suit against the appellees, El Paso & Northeastern Railroad Company, and various other railroad companies, alleging that the defendants were railroad corporations engaged in business as common carriers, owning and operating a line of railroad extending from El Paso, Tex., to Kansas City, Mo.; that on October 27, 1911, in consideration of the freight rate paid to the defendant El Paso & Southwestern Company, the El Paso & Northeastern Railroad Company, for itself and its codefendants, agreed in writing signed by the plaintiff and El Paso & Southwestern Company to safely carry from El Paso to Kansas City, Mo., and there deliver to the First National Bank of Kansas City, the consignee at said place, 847 head of cattle of the value of $20,000, the property of plaintiff, then and there at El Paso, in pursuance of said agreement, delivered to the El Paso & Northeastern Railroad Company, in pursuance of the agreement made by the El Paso & Southwestern Company, who then and there received and accepted the cattle upon the agreement, and for the purposes mentioned in behalf of the defendants; that defendants did not safely carry and deliver said cattle in pursuance of said agreement, but so carelessly and negligently acted in regard to the same in their business as common carriers that the cattle were lost to the plaintiff and not delivered to the said consignee to the plaintiff's damage in the sum of $10,101.18; that defendants have failed and refused and still fail and refuse to deliver the cattle to the First National Bank, consignee, in pursuance of said agreement, or to the plaintiff, and by reason of the carelessness and negligence of defendants the plaintiff has been damaged as aforesaid, for which judgment was prayed.

The answer of the defendant is quite lengthy and need not be stated at length. It is sufficient to say that among other defensive matters pleaded it was set up that the contract was in writing and was entered into by the plaintiff through its agent J. A. Peters, who instructed appellees to deliver the cattle at Kansas City to J. P. Peters Commission Company, which was done; that the order to so deliver the cattle was in fact a part of the transportation contract, but the failure to indorse such order on the same was due to mutual mistake of the parties; and that such delivery discharged them.

By a supplemental petition the plaintiff replied to certain defensive matters set up by the defendants, namely, the two years'

statute of limitation, and a failure to give written notice of the damages within four months as provided by the bill of lading. In this supplemental petition it is again averred that the terminal carrier never in fact delivered the cattle to the plaintiff, the consignor, or to the First National Bank of Kansas City, or to any other person or corporation authorized by the consignor or consignee, by the terms of the contract to receive delivery.

By a trial amended petition it was averred that the defendants issued and delivered the bill of lading for the shipment without inserting therein that the consignee should be the First National Bank of Kansas City, Mo., care of J. P. Peters Commission Company, and that it was through negligence and fault of defendants in permitting the bill of lading to be so issued and delivered to the plaintiff herein without giving notice to it or advising it that there had been direction or instructions by J. A. Peters to bill or ship the cattle to the First National Bank, care of J. P. Peters Commission Company, and had said bill of lading contained said directions plaintiff would not have accepted same, but had accepted the bill and relied thereon without notice of said intention and had the bill contained the directions alleged to have been given by Peters, plaintiff would have notified the defendant not to deliver the cattle to the Peters Commission Company, and by reason of their conduct and act in putting into circulation, issuing and delivering and permitting to be issued to plaintiff said bill of lading without said instructions (care of Peters & Company) thereon, the defendant was estopped to deny same, its effect or its validity, or to set up any undertaking or agreement with said J. A. Peters.

The case was tried before a jury and submitted upon special issues, and upon the jury's findings judgment was rendered in favor of the defendants, from which the plaintiff prosecutes this appeal.

The record discloses that for some time prior to the date of the shipment in question John T. Cameron had been buying cattle in the interior of Mexico and shipping them to Juarez, Mexico, whence they were entered into the United States at El Paso.

According to the testimony of J. F. Williams, vice president of the plaintiff, Mr. Cameron would buy the cattle in Mexico with money furnished by a bank at Chihuahua. That bank would consign the cattle to the plaintiff with draft attached for the amount of the purchase price. After being cleared through the custom house and delivered to the plaintiff on the American side, plaintiff would then refund the purchase price to the Chihuahua Bank and take over the transaction from Cameron and ship the cattle to Kansas City for sale; that they had no arrangement for any one to handle them

in Kansas City; that J. A. Peters was an employee of Cameron and looked after the shipping of the cattle and billed them out under our instructions. Williams was the representative of the plaintiff in handling the transactions relative to the Cameron cattle, and further testified that neither he nor any one else from the bank looked after the shipments; that J. A. Peters looked after the shipments, or nearly all of them, and that he knew J. A. Peters was looking after the shipments; that they presumed he was shipping the cattle to Kansas City; and that they were being handled there by the J. P. Peters Commission Company. He admitted that the bank was allowing J. A. Peters to bill the cattle out for it and look after getting the cattle to Kansas City. He testified that Peters brought him the bill of lading covering the shipment in question and it was attached to a draft drawn on the J. P. Peters Commission Company of Kansas City for the amount of the money advanced by the bank and that this draft and bill of lading was sent to the First National Bank of Kansas City with instructions to release the cattle to the commission company upon payment of the draft. The draft was never paid, and the same together with the bill of lading was later returned to the plaintiff.

It was further shown by the evidence that the shipment in question was the last of the Cameron shipments and that prior to that time there had been 18 or 20 train loads of the Cameron cattle which had been handled and shipped out by the plaintiff in the manner aforesaid, the transactions having extended over a period of several months. This last shipment of cattle was delivered by the terminal carrier to the J. P. Peters Commission Company at Kansas City, Mo., without the surrender of the bill of lading.

The material portions of the bill of lading are as follows:

"Contract.

"Executed in duplicate at El Paso, Texas, Station, October 27, 1911.

"This agreement made between the El Paso & Southwestern Company of the first part, and City National Bank of the second part, witnesseth:

"That for the consideration and mutual covenants, and conditions herein contained, the said first party will transport for the said second party the livestock described below, and the parties in charge thereof, as hereinafter provided: 28 cars, said to contain 147 head of cattle, from El Paso, Texas, station to Tucumcari station, consigned to the First National Bank, Kansas City, Mo., at published tariff rate; said rate being less by virtue of the execution of this contract than rate for shipment transported without limitation of carrier's liability except at common law, and in consideration of said rate, and other considerations, it is mutually agreed between the parties hereto as follows:"

In paragraph 3 of the bill of lading it was

provided that the second party at his own risk and expense is to take care of, feed, water and attend to, said stock, etc., and holds first party harmless on account of any loss or damage to his said stock while being in his charge and attended by him or his agents or employees.

In paragraph 5 it was provided: "That when first party shall furnish for the accommodation of second party laborers to assist in loading or unloading his stock, they shall be entirely subject to his orders."

In paragraph 6 it was also recited: "That second party expressly agreed that as a condition precedent to his right to any damage to his said stock, second party will give notice in writing of its claim therefor," etc.

"Eleventh. No person other than the owner of the stock shipped, or his duly authorized agent in the name of the owner, shall be allowed to sign this contract."

"Thirteenth. First party hereby admits that it has received at the station and on the date first above written, from second party, certain livestock as hereinbefore described, to be transported as aforesaid at the rate or rates, and subject to the rules and conditions hereinbefore and hereinafter referred to, and agrees that said livestock will be delivered as aforesaid unto second party or order, or assigns, or connecting lines if destined beyond, subject to the conditions hereinbefore and hereinafter expressed on the payment of transportation charges as agreed."

The contract was signed thus:

"J. C. Wallwork, Agent for the Company. City National Bank, by J. A. Peters, Shipper."

The waybills covering the shipment bore this notation:

"Name of Shipper: City National Bank.

"Name of Consignee: First National Bank, Kansas City, Mo., c/o J. P. Peters Commission Company, Priv. St. Louis, Mo."

The waybills accompanied the shipment and were for the information and guidance of the employees of the defendants in handling the shipment. The cattle were delivered by the terminal carrier to the J. P. Peters Commission Company upon the notations made upon the waybills.

The issues submitted to the jury and answers thereto were as follows:

"Question No. 1. Do you find from the evidence by a preponderance thereof, that contemporaneous with, or just prior to the execution and delivery of the bill of lading covering the shipment of cattle in question in this suit, it was mutually agreed by and between J. A. Peters, acting for the City National Bank, and the agent of the receiving carrier at El Paso, Tex., that such cattle should be consigned by the bill of lading to the First National Bank of Kansas City, Mo., care of the J. P. Peters Commission Company? Answer. Yes.

"Question No. 2. Do you find from the evidence, by a preponderance thereof, that when the bill of lading covering the shipment of cattle in question was issued that the same, by the mutual mistake of J. A. Peters, acting on behalf of the City National Bank, and the said agent of the defendant carriers acting in their behalf, omitted to state in the bill of lading in accordance with their mutual agreement, that the cattle were consigned to the First National Bank care of the J. P. Peters Commission Company, if such agreement there was? Answer. Yes.

"Question No. 3. Do you find from the evidence, by a preponderance thereof, that J. A. Peters, directed the agent of the defendant carriers receiving the cattle at El Paso, shipment of which is in question, to place on the waybill that the cattle were consigned to the First National Bank of Kansas City in care of the J. P. Peters Commission Company? Answer. Yes.

"Supplemental Question by Court. Was such direction on the part of J. A. Peters to said agent, if you have found he gave such direction, prior to, contemporaneous with, or subsequent to the execution and delivery of the bill of lading covering this shipment of cattle? Answer. Contemporaneous with.

"Question No. 4. Do you find from the evidence, by a preponderance thereof, that in the case of the shipments of cattle made prior to the shipment in question, said prior shipments consigned by bills of lading by the City National Bank of El Paso, Tex., to the First National Bank of Kansas City, that the delivering carrier delivered same to the J. P. Peters Commission Company at Kansas City, prior to the payment of the drafts drawn on the Peters Commission Company attached to the bills of lading? Answer. Yes.

"Question No. 5. Do you find from the evidence, by a preponderance thereof, that in cases of prior shipments of cattle inquired about in question No. 4, that the said First National Bank had notice prior to the arrival of the shipment in question herein, that the delivering carrier had delivered such prior shipments or some of same to the Peters Commission Company prior to the payment of the drafts drawn on said Peters Commission Company for such prior shipments, if any of them had been delivered prior to the payment of the drafts, and said bank ratified and acquiesced therein? Answer. Yes.

"Question No. 6. Do you find from the evidence, by a preponderance thereof, that in reliance upon the ratification or acquiescence of the First National Bank of Kansas City in the delivery of said prior shipments of cattle to J. P. Peters Commission Company before the payment of the drafts attached to the bills of lading, if said shipments had been delivered prior to the payment of the drafts, and said bank did ratify or acquiesce therein, that the delivering defendant delivered the shipment of cattle in question in this suit to the J. P. Peters Commission Company without the payment of the draft attached to the bill of lading? Answer. Yes.

"Question No. 7. Do you find from the evidence, by a preponderance thereof, that the acquiescence or ratification of the First National Bank of the delivery of prior shipments before payment of the drafts attached to the bills of lading, if prior shipments were so delivered and the First National Bank acquiesced and ratified same, was reasonably sufficient to induce the belief on the part of the agent of delivering defendant carrier that said J. P.

Peters Commission Company was duly authorized to receive said cattle for the First National Bank of Kansas City? Answer. Yes.

"Question No. 4 Requested by Plaintiff. Do you find from the evidence, by a preponderance thereof, that had such bill of lading recited that the cattle were to be delivered to the First National Bank, care of the J. P. Peters Commission Company, that plaintiff could and would have notified the defendants, prior to the delivery to the J. P. Peters Commission Company, not to deliver said cattle without the payment of the draft in the First National Bank of Kansas City? Answer: No."

Jarvis, the bill clerk of the receiving carrier, testified that J. A. Peters gave the bill of lading instructions on the cattle, and that his instructions were that the cattle were billed from the City National Bank to the First National Bank of Kansas City, care of the J. P. Peters Commission Company, and that there had been previous shipments during the month on which Peters had given the billing instructions; that he wrote the waybills to accompany the shipments at the direction of J. A. Peters; and that he was asked by Peters to waybill the cattle to the First National Bank of Kansas City, care of the J. P. Peters Commission Company.

J. A. Peters testified:

"They came up here from Mexico, having been purchased by Mr. Cameron consigned to the City National Bank of this city. That is what I mean by 'legal title,' that they were consigned to the City National Bank here. When they reached El Paso, they were handled in the Southwestern stockyards, fed, watered, and entry made at this port. I took charge of them on behalf of the City National Bank when they reached here, and have them handled. They were handled in public stockyards, which serves the public generally. I took charge of them not only at the instance of the City National Bank but also of Mr. Cameron and the Peters Commission Company of Kansas City. I had charge of them down there in the stockyards. I do not know how long they remained there before being shipped out; it took two or three days to get them released and forwarded on. I signed all the contracts and looked after that, and all the shipments we had. I signed the live stock contract under which the cattle moved out of here as agent of the City National Bank. I signed it 'City National Bank by J. A. Peters.' I had been handling all of those shipments; this was one of numerous shipments. This is the contract which I executed, that bears date October 27th. These are the waybills issued by the El Paso & Southwestern System, dated October 27, 1911, under which the cattle in question moved. It appears in those waybills that the cattle were consigned by the City National to the First National Bank of Kansas City, care of J. P. Peters Commission Company. I billed them that way. As to whether I directed the clerk of the railroad that issued the bill of lading to bill them that way, that is the billing I gave the clerk of the railroad, that issued the bill of lading at the joint warehouse. I think I gave the agent the directions, with reference to the shipment, at the same time the contract was executed. My recollection is so, undoubtedly so. When I executed the contract I directed the agent how to bill. I directed him to bill care of the J. P. Peters Commission Company. I don't remember exactly, but I should judge that was about the eighteenth or twentieth train of cattle that we had handled from Mexico consigned by the City National Bank to the First National Bank of Kansas City about that time. Practically all of those shipments were handled under the same agreement between Mr. Cameron and the City National Bank and myself. Those shipments were made before the shipment in question, right up to two or three or four trains a week, up to the time of this shipment. Prior to the date of this shipment I had been handling these 18 or 20 shipments at the rate of about 3 or 4 train loads a week. I do not remember if I took the contract under which these cattle moved after I had executed it; I might have taken the contract at that time, or they might have called a messenger, and had it sent up to the bank; we bill the cattle out, but we don't get the contract until after the cattle are loaded, so they can put the car numbers on them. It was customary at that time, if I had time, I went down and got the duplicate contract myself, but if I was busy I sent a messenger. This contract was sent to the City National Bank and attached to draft on Peters Commission Company, Kansas City. After I had given directions about the waybills and the contracts had gone to the bank, I signed the draft to which the duplicate contract was attached. I had nothing to do with it. After the cattle left town I had nothing further to do with it. * * *

"The first shipments of the 18 or 20 were not consigned to the First National Bank care J. P. Peters Commission Company like this shipment was; I do not remember just how many were, but several shipments previous to this one were consigned the same way as this shipment. I know the reason why the cattle going to Kansas City were consigned to J. P. Peters Commission Company in this particular case: I might explain that better by an illustration of one shipment that arrived there during the night in very poor condition, and being billed to the bank, we could not get the cattle released until the bank opened in the morning, and by the time we got back from the bank with the bill of lading, it would be about 9:30, so that by the time we got possession of the cattle and fed and watered them, the day's market would be over. That happened during the fore part of the shipments. Subsequent to that time the waybills were changed so as to send them care of J. P. Peters Commission Company.

"Cross-Examination.

"I do not remember that the City National Bank ever instructed me to bill these cattle in care of the Peters Commission Company. They never did that I remember of. I had no authority to sell the cattle without handling them for the City National Bank; we sold numerous shipments here. * * *

"I do not remember that the City National Bank authorized me to bill these cattle care of the Peters Commission Company instead of to the First National Bank of Kansas City. I do not remember of ever talking to them about it,

or telling them that I had done it. I would not want to swear either way. * * *

"My interest in the cattle was merely an equity and the City National Bank had title and possession and claimed the cattle until their money was repaid to them, and it was the understanding that I had no right to release those cattle from the possession and ownership of the City National Bank by anything that I did until they were first paid for."

Other facts in the case will be indicated in the course of the opinion.

The assignments will not be considered in the order in which they are presented.

Under the tenth and eleventh assignments it is contended that the answers of the jury to questions 1 and 2 are contradictory to and unsupported by the evidence. The shipping clerk, Jarvis, testified that Peters directed that the cattle be billed to the First National Bank, care of the J. P. Peters Commission Company. J. A. Peters also testified that he directed the clerk how to bill the cattle and to bill them to Kansas City, consigned to the First National Bank, care of the J. P. Peters Commission Company.

J. A. Wallwork, the joint agent of the defendants, testified that a bill of lading always precedes the waybill and that the waybills are made up from the bills of lading; that waybills are for the information of the conductor of the train and accompany the shipments and the shipper has nothing to do with waybills; that while waybills should be made out to conform to the bills of lading, but sometimes the contracts are made up and the shipper comes around and asks you to add something and you put it on one and forget to put it on the other. Neither the shipping clerk, Jarvis, nor Peters, explained why the bills of lading did not show that the cattle were shipped to the First National Bank, care of the J. P. Peters Commission Company; but it clearly appears from the evidence indicated that instructions to that effect were given by Peters, and that in billing the cattle the shipping clerk was governed by his instructions and should have made the proper notation to that effect upon the bills of lading, but for some unexplained reason failed to do so, but the inference is that both Peters and Jarvis mutually overlooked incorporating the full instruction in the bills of lading. Under the evidence indicated, questions Nos. 1 and 2 are amply supported by the evidence.

Under the twelfth, thirteenth, and fourteenth assignments the sufficiency of the evidence to support the findings upon issues 5, 6, and 7 is questioned. There may be no direct evidence to support these findings, but in the light of all the facts and circumstances in the case the findings are supported; but under the view this court takes of the case these findings are noncontrolling and it is immaterial whether or not the evidence supports same.

The fourth assignment is to the effect that there was no evidence to show that J. A. Peters was authorized by plaintiff to ship or bill the cattle in care of the J. P. Peters Commission Company, and that the burden of proof was upon the defendants who are seeking to reform the contract to show that Peters was authorized by plaintiff to so bill the same, and in the absence of such proof plaintiff is not bound thereby. In view of the failure of the plaintiff to deny under oath the authority of Peters to execute the written contract in question, it may be doubted whether the appellant is in a position to question his authority in the premises. Article 1906, subd. 8, R. S. But waiving this consideration, Peters clearly was acting within the apparent scope of his authority when he gave the billing directions in question, and appellant therefore cannot avail itself of any secret limitation upon his authority. It is shown that there had been many preceding shipments of the Cameron cattle, and that in most of these preceding shipments Peters had acted for the bank in shipping and billing the cattle out. A shipper who intrusts to another authority to ship a commodity apparently confers upon him plenary power to give the necessary billing instructions, and, unless the carrier has knowledge of some fact sufficient to put it upon notice of a limitation upon such apparent general authority of the shipping agent, such carrier is not bound by any secret limitation imposed by the shipper upon his agent. There is nothing to indicate that the receiving carrier in this case had any knowledge of any limitation upon the authority of Peters to give billing instructions, but apparently he had plenary power in this respect conferred upon him by the appellant, and it is bound by the instructions which he gave.

Under the first and second assignments it is asserted that the court erred in refusing to give a peremptory instruction in favor of the plaintiff, and that the court erred in rendering judgment in favor of the defendants because under the pleadings and bill of lading and the evidence and findings of the jury the defendants were not entitled to a verdict.

It is contended by the appellant that the thirteenth paragraph of the shipping contract constituted what is commonly known as an "order" bill of lading; that the bill of lading upon its face discloses that the plaintiff was the owner of the cattle, and by the thirteenth paragraph reserved to itself the jus disponendi, and defendants had not the right to deliver the cattle to any one but the plaintiff or his order and upon production and surrender of the bill of lading properly indorsed and having failed to deliver to the plaintiff, or its order, and without surrender of the bill of lading, the defendants are liable; that, where a shipment is made

upon a shipper's order bill of lading, the carrier cannot excuse himself for misdelivery unless such misdelivery is due to the fault of the shipper. The appellant takes the position that an order bill of lading is radically different from what is commonly known as a "straight" bill of lading and the rules of law applicable to order bills of lading are to be here applied. Numerous authorities are cited to the effect that a bill of lading containing provisions similar to that contained in the thirteenth paragraph constitute an order bill of lading, that under such bills the jus disponendi is reserved to the shipper, and that the carrier has no authority to deliver to any one except the shipper or his order and upon surrender of the bill of lading properly indorsed. The correctness of the authorities cited is not questioned, but upon the issues presented by appellant's pleading they have no application here. The substance of the plaintiff's petition has been indicated at some length, and it predicated its cause of action upon a contract which it alleged bound the carriers to safely carry the cattle to Kansas City and there deliver the same to the First National Bank, and that defendants had failed and refused to deliver to said bank, or to plaintiff, or to any other person or corporation authorized by the consignor, or the consignee, by the terms of said contract to receive delivery.

[1] If the contract be reformed so as to show that the cattle were billed to the First National Bank, care of the J. P. Peters Commission Company, then the allegations of the petition would fail, for delivery to the commission company was shown. It has been a number of times held that where goods are shipped to the consignee, care of another person, it is a sufficient delivery if made to the person in whose care the goods were so shipped. Elliott on Railroads (2d Ed.) par. 1524a; Ela v. Express Co., 29 Wis. 611, 9 Am. Rep. 619; Russell v. Livingston, 16 N. Y. 515; Express Co. v. Hammer, 21 Ind. App. 186, 51 N. E. 953.

In this state it has been often held that the sending of a telegraphic message in care of a third person necessarily constitutes such third person the agent of the sendee with authority to receive the message and that delivery to the third person is sufficient. Tel. Co. v. Young, 77 Tex. 245, 13 S. W. 985, 19 Am. St. Rep. 751; Tel. Co. v. Shaw, 40 Tex. Civ. App. 277, 90 S. W. 58. There is no reason why the same rule should not apply to a contract of carriage.

[2] Under the contract, as pleaded, the carriers were bound to carry the cattle to Kansas City and there deliver to the First National Bank, and the cause of action is predicated upon the failure of the bank to deliver to such consignee or to plaintiff, or to any other person authorized to receive the same. Had the petition declared upon a contract binding the carriers to transport and deliver to the shipper, or his order, the authorities and argument of the appellant would be applicable. Not having declared upon a shipper's order contract which reserved the right of disposition to the shipper, the plaintiff is not entitled to recover simply because his evidence shows a contract of that nature. Evidence, however, adduced without pleading to support it, will not support a judgment. Middlebrook v. Zapp, 73 Tex. 29, 10 S. W. 732; Jamison Gin Co. v. Measels, 207 S. W. 365, and cases there cited.

Under the third assignment the proposition is advanced that the defendants were not entitled to reform the shipping contract so as to show a billing in care of the J. P. Peters Commission Company because the alleged mistake was caused by its negligence, and for the further reason that mistake will not be relieved against and an instrument reformed where the opposing party cannot be put in statu quo.

[3] As to the negligence of the parties, it would seem that the bank's agent, Peters, was equally at fault with the shipping clerk, Jarvis. The term "mistake" carries with it the idea of fault, but the mere fact that a mistake was made in an instrument does not show such negligence as to bar the right of reformation, for, if that were so, a court of equity could never interfere. In Kelley v. Ward, 94 Tex. 289, 60 S. W. 311, this same contention was made, and in thus disposing of the same Justice Williams said:

"Where both parties are thus mistaken as to the effect of the writing and ignorant of its misstatement of the agreement, the failure of one to understand, through omission to read or give sufficient attention to its contents, cannot avail as a defense to the other, equally in fault, against a suit to correct such mistake. Referring to this subject, the Court of Appeals of New York, in the first case above cited, says: 'Indeed, in most of the cases to be found in the books, where relief has been sought against written instruments on the ground of fraud and mistake, the complaining parties were chargeable with the same kind of negligence which exists in this case, to wit, the omission to read or understand the contents of instruments executed or accepted. It has certainly never been announced as the law in this state that the mere omission to read or know the contents of a written instrument should bar any relief by way of a reformation of the instrument on account of mistake or fraud. It is the general rule that where a written instrument fails to conform to the agreement between the parties in consequence of the mutual mistake of the parties however induced, or the mistake of one party and fraud of the other, a court will reform the instrument so as to make it conform to the actual agreement between the parties.' In most of the cases referred to, the provisions of the writings against which relief was sought were quite as plain as those of the instrument here involved.

· "The mere fact, therefore, that Ward and his attorney failed to understand the writing according to its true legal effect, when the opposite party shared in the error, cannot be held by this court as legally precluding him from relief."

[4] Upon the authority of that case and many others which might be cited, the contention of appellant that the right to reform the instrument is barred by the appellee's negligence is overruled. Neither is there any merit in the contention that the instrument should not be reformed so as to show the true agreement and intention of the parties because the bank cannot be put in statu quo. It seems to us that there is nothing in this case to prevent the application of the well-settled rule that a contract will be reformed so as to show the true agreement between the parties where, by mutual mistake, the contract as drawn fails to do so. The jury having found that the bill of lading by mutual mistake failed to show that the cattle were to be billed to the First National Bank, care of the J. P. Peters Commission Company, the court properly treated the contract as it should have been written. Ross v. Armstrong, 25 Tex. Supp. 368, 78 Am. Dec. 574; 'Kelley v. Ward, supra.

[5] The fifth assignment complains of the refusal to submit an issue requested by the appellant, as follows:

"Do you find from the evidence, by a preponderance thereof, that the plaintiff, City National Bank, on receipt of the bill of lading in question in this suit, relied on same as expressing the true contract between the parties, and were without notice that the waybill directed that the cattle be delivered to the First National Bank care of J. P. Peters Commission Company?"

This issue was noncontrolling, and, had it been submitted and answered in favor of the appellant, it would not have affected the right of the defendants to a judgment under the pleadings, evidence, and other findings of the jury.

The sixth, seventh, and eighth assignments relate to the admission of evidence. The error, if any, in the admission of this testimony, was harmless and is not ground for reversal.

[6, 7] Under the ninth assignment error is also assigned to the admission of evidence to the effect that it was the general custom in Kansas City to handle and deliver cattle shipments on the waybills. The proposition being that the positive and unambiguous terms of the written contract as evidenced by the bill of lading cannot be controlled by a custom that varies therewith. This testimony was admissible for the purpose of showing that the cattle were handled in the manner that J. A. Peters, appellant's shipping agent, knew they would be handled and intended that they should be handled and in

corroboration of the contention of the appellant that the true contract and agreement between the parties was to deliver these cattle to the J. P. Peters Commission Company, which direction was omitted from the bills of lading by the mutual mistake of the shipping agent, Peters, and the bill clerk of the receiving carrier. But if it be not admissible its erroneous admission presents no ground for reversal, as the controlling facts in this case are that J. A. Peters, appellant's shipping agent, acted within the apparent scope of his authority in directing that the cattle be shipped in care of the J. P. Peters Commission Company; the further fact that by mutual mistake such direction was not incorporated in the shipping contract; the fact that the cattle were delivered to the Peters Commission Company, and that plaintiff's cause of action is based upon a contract, which, it was alleged, bound the carriers to deliver the cattle to the consignee.

Upon the ·views expressed, all of the assignments of the appellant are overruled, and the judgment affirmed.

## On Rehearing.

Appellant's counsel has filed a most able motion for rehearing, but we see no reason to recede from the views heretofore expressed. In the consideration of the motion we have been greatly assisted by an opposing argument presented by counsel for the appellees. In the preparation of this opinion upon rehearing we, in great measure, use the opposing argument of appellees' counsel.

[8] In its motion appellant calls attention to the failure in our opinion to directly pass upon the issue presented under the first assignment of error to the effect that this case should be controlled by the Carmack Amendment to the Hepburn Act of the federal Congress enacted June 29, 1906. This law was in effect when the shipment in question was made. In substance that act provides that any common carrier receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it, or by any common carrier to which such property may be delivered, or over whose lines such property may pass. It is insisted that appellant was the lawful holder of the bill of lading issued in this case at the time the cattle were delivered to the J. P. Peters Commission Company, and therefore the case comes within the provisions of the Carmack Amendment. The question in this case, as the suit is brought, is not a question of who is the proper party plaintiff, but a question of whether or not the carrier caused any loss. As we view it, the bank caused the loss by directing the carrier (through its agent, Peters) to deliver the cattle to the Peters Com-

mission Company. Plaintiff's contention in effect is that, in saying "shall be liable to the lawful holder," the Carmack Amendment (U. S. Comp. St. §§ 8604a, 8604aa) by implication prevents a delivery to any one except the lawful holder of the bill of lading, and the question now to be determined is whether this is rigidly to be implied from the Carmack Amendment. As touching upon this question, we quote from the case of Cincinnati Railway v. Rankin, 241 U. S. 327, 36 Sup. Ct. 558, 60 L. Ed. 1022, L. R. A. 1917A, 265, where, in a shipment case, Justice McReynolds said:

"Rights and liabilities of the parties depend upon the acts of Congress, the bill of lading, and common-law rules as * * * applied in federal tribunals."

Referring to the holdings in some of the decisions cited by appellant:

Ry. Co. v. Ward, 244 U. S. 386, 37 Sup. Ct. 617, 61 L. Ed. 1213, simply holds that in an interstate shipment the contract with the initial carrier takes precedence and controls as against the contract of the connecting carriers.

T. & P. v. Leatherwood, 250 U. S. 481, 39 Sup. Ct. 517, 63 L. Ed. 1096, simply holds that the first contract embodies the contract for transportation, and its terms in respect to conditions of liability cannot be varied by succeeding contracts.

Adams v. Croninger, 226 U. S. 507, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257, holds that the liability to the lawful holder is not a liability of an insurer, but only the common-law liability; and, further, that a limitation fairly based on tariff and schedules is valid.

Atchison v. Robinson, 233 U. S. 173, 34 Sup. Ct. 556, 58 L. Ed. 901, merely holds than an oral contract cannot be allowed, when in conflict with the tariff and schedules.

As bearing upon this question, see Ry. Co. v. Vasbinder, 172 S. W. 763, where it was held that the Carmack Amendment does not render invalid all oral contracts of shipment, but only those which are in conflict with the schedules and rates published by the Interstate Commerce Commission. In Railway Co. v. Meyer, 155 S. W. 312, it was held that the term "lawful holder" embraced the owner of the property transported or any one beneficially entitled. In both of these last two cited cases writs of error were refused by the Supreme Court of Texas.

It has also been held that the consignor, though not the lawful holder of the bill of lading, can bring an action for loss. Aultman v. Coast Lines (Fla.) 71 South. 284; Bowden v. Railway Co., 5 Boyce (Del.) 146, 91 Atl. 209.

Those cases show that the implication from the Carmack Amendment for which appellant contends, namely, that delivery could only be made upon surrender of the bill of lad-ing, is not a rigid implication, and, while there may be cases in which that implication would be applied, still, the general principles of the common law as said by the Supreme Court obtain, and the implicated rule is only applied subject to the relative rights, liabilities, and duties of the parties as governed by the facts and the form of the action brought.

The Coovert Case, 80 Wash. 87, 141 Pac. 324, upon which appellant relies, is a perfect illustration of this. In that case, delivery was made to the consignee, after the railroad had been notified by the consignor that the bill of lading had been returned to it, and after it had surrendered the bill of lading to the railroad and demanded the goods—clearly, of course, a wrongful delivery.

The Nebraska Meal Mills v. St. Louis & Southwestern Railway, reported in 64 Ark. 169, 41 S. W. 810, 38 L. R. A. 358, 62 Am. St. Rep. 183, is almost identical with the case at bar, and is illustrative of the contention which appellees make, namely, that appellant cannot, by its own wrongful action, induce the carriers to make a given delivery, and then, standing upon a rigid technical rule of law, ask the court to overlook its wrong actions, and to award damages against the carrier for the very delivery which it directed.

In the Nebraska Meal Mills Case, above cited, that corporation delivered to the Missouri & Pacific a carload of meal for shipment to E. D. Russell in Arkansas. A bill of lading was issued in which it was stipulated that the meal was to be transported to destination and there delivered to the consignee, Russell. The appellant, without notice to the railroad, drew a sight draft on Russell for the price of the meal, attached it to the bill of lading, and forwarded it to a bank for collection. The bank presented the draft for payment, but Russell was insolvent and failed to pay. The connecting carrier, having no notice that a draft had been drawn on Russell, or that Russell was insolvent, or that the consignor desired to retain control of the meal until the draft was paid, delivered the meal without requiring the production of the bill of lading.

In that particular case, the court quotes the bill of lading as having been "straight," but to our minds it was no more a straight bill of lading than the one in this case is. That is to say, an order bill of lading, in the common acceptance of the term, would read: "City National Bank, consignor, to order of City Bank, consignee, notify Peters Commission Company."

The instant bill of lading named the First National Bank of Kansas City as consignee, and, as the jury found the facts, the bill of lading must be considered as reading: "Consignee, First National Bank, care J. P. Peters Commission Company."

In Arkansas there was a statute providing that any and all persons, to whom the bills of

lading may be transferred, shall be deemed and held to be the owners of the goods, and no property specified in such bills of lading shall be delivered except on surrender and cancellation of the bills of lading.

The court said:

· "If, as counsel for appellant contends, the bill of lading represented the meal, and the ownership of the meal was in appellant so long as it held the bill of lading, still, as such owner, it unconditionally directed the carrier to deliver the meal to Russell. It would seem unreasonable to believe that the Legislature intended to impose a liability upon the carrier in favor of the consignor for obeying and carrying out the directions of such consignor in regard to the delivery of the consigned property, for such intention would be contrary to common principles of reason and justice."

It has been repeatedly held that, although the shipper's agent had really no authority to limit the value of a shipment, yet, if by his principal he was placed in charge of the shipment, the carrier could rely upon his instructions and the principal would be bound thereby. American Brake Shoe Co. v. Marquette Railway (D. C.) 223 Fed. 1018; G. N. Railway v. O'Connor, 232 U. S. 508, 34 Sup. Ct. 380, 58 L. Ed. 703.

[9] As to the purpose of the Carmack Amendment: It has also been held that the consignor, though not the lawful holder of the bill of lading, can bring an action for loss. Aultman v. Coast Lines (Fla.) 71 South. 284; Bowden v. Railway Co., 5 Boyce (Del.) 146, 91 Atl. 209. But aside from these matters the rule for which appellant contends has no application to this case. This for the reason that appellant is bound by its pleadings. It could only recover as it has pleaded and upon the cause of action asserted by it.

Appellant alleged a breach of an agreement to deliver to the First National Bank of Kansas City, the consignee named in the bill of lading.

The jury has found that the delivery could lawfully be made care Peters Commission Company, so that appellant's cause of action, as pleaded by it, has failed; the delivery to the commission company being in view of the jury's finding a delivery to the First National Bank.

Appellant now relies upon a new cause of action for delivery without surrender of the bill of lading.

The plaintiff alleged that defendants agreed in writing to carry from El Paso, Tex., to Kansas City, and there to deliver to First National Bank of Kansas City; that the defendant did not carry and deliver said cattle, but so negligently acted as that the cattle were not delivered to said consignee.

As said in the original opinion, the cause of action is predicated upon the failure of the carrier to deliver to the consignee, or to the plaintiff, or to any other person authorized to receive the same. The plaintiff can only recover in accordance with his pleadings. Many Texas cases have announced this well-settled rule.

Galm v. Wabash Railroad Co., 113 Mo. App. 591, 87 S. W. 1015, which holds that if the pleader alleges specific actions of negligence he must prove the acts alleged, else he will fail in his action.

Chitty v. St. Louis Iron Mountain & Southern Railway (Mo.) 49 S. W. 870. In this case the petition alleged that the plaintiff was a passenger in the caboose of the train and was injured by being thrown out of the door. It was held that he could not recover by showing that he had reasonable cause to apprehend a collision and jumped out of the door.

Norton v. G., H. & S. A. Railway Co., 108 S. W. 1045. The character of an action is fixed by the allegations in the pleadings and not by facts subsequently disclosed by the evidence; where plaintiff seeks to recover on the ground that the rails had not been properly spiked to the ties, he cannot recover on other grounds.

G., C. & S. F. Railway v. McKinnell, 173 S. W. 937. The object of pleading is to apprise the court and the opposite party of the facts upon which the pleader relies as constituting his cause of action; and neither party can be held legally bound to answer grounds not averred in the pleading.

To the same effect, Lemon v. Hanley, 28 Tex. 221.

We think it is clear, therefore, that appellant's reliance upon the rule that the bill of lading, as an order bill, carries the title to the goods, comes too late. The action as brought by it was not founded upon delivery without surrender of the bill of lading, but was a straight suit, to recover against us for failure to deliver to the First National Bank.

In other words, it seems that appellant is seeking to recover upon an issue not tendered by its pleadings.

The case of Lee v. Boutwell, in the 44th Tex. page 151, does not sustain appellant's proposition. In that case, plaintiff and defendant entered into a verbal contract. The plaintiff was to take charge of a stock of horses for the defendant, for which he was to receive every fourth colt. He alleged that the defendant took the horses out of his possession and prevented his performance of the contract. He did not sue for the profits he might have made, but sued for the expense that he had been put to, in preparing to carry out the contract. As he alleged it, he proved it, and it was only in the prayer that he had not sufficiently pleaded, and this the court held the prayer for general relief corrected.

This brings us to the question of whether J. A. Peters was the agent of the City Bank, to handle and ship these cattle. Reference is made in this connection to the cases cited

above—American Brake Shoe Co. v. Marquette Railway (D. C.) 223 Fed. 1018; G. N. Railway Co. v. O'Connor, 232 U. S. 508, 34 Sup. Ct. 380, 58 L. Ed. 703.

If Peters was the agent of the City National Bank, then appellant's theory fails, and we have simply an instance where the City National Bank, desiring to ship cattle to Kansas City, first consigned them to the Kansas City Bank, but finding that it might in that way lose a day's market—as it did in one instance—it directed the carrier, thereafter, to · so ship them as that they should be delivered "care Peters Commission Company," intending thereby that the cattle should be so billed as that they would be delivered to the Peters Commission Company.

Having done this and having made a loss through the failure of the commission company to account for this shipment, the City Bank now seeks to shift that loss to the carrier, by taking the position that the Carmack Amendment and authorities in general make the carrier liable to the holder of the bill of lading, and take the position that, the City Bank being the holder, it can recover of the carrier, notwithstanding the fact that it (through its agent) directed the carrier to deliver the cattle to the Peters Commission Company. Having obtained the true basis of the relative rights and liabilities of the parties, let us first inquire:

Was J. A. Peters the agent of the City Bank to ship the cattle?

[10] The outstanding feature of this question is contained in the testimony of J. F. Williams, vice president of the City Bank, as follows:

"I did not personally go down to the railroad office to ship them. No one from the bank personally went and looked after that.

"There had been quite a number of these shipments prior to this particular one, and Mr. Peters had looked ·after all, or nearly all, of them. I knew that he had been looking after the shipments. We knew that these cattle were being handled (at Kansas City) by the J. P. Peters Commission Company. We were allowing Mr. J. A. Peters to bill them out for us and look after getting them up there."

Without reference, at this point, to the further testimony in the case of J. A. Peters and the defendants' agents, we have now the facts: (a) That the bank knew that somebody had to go to the railroad office and make the shipping arrangements; (b) that the bank allowed J. A. Peters to do this and that it knew he was doing it; (c) that nobody else from the bank went to the railroad office or had anything to do with making the actual billing arrangements.

Thus Peters became the agent of the bank, with plenary power to ship the cattle as and to whom he saw fit. No secret limitations of his authority, if such there were, would affect or bind the carrier. He was the only

225 S.W.—26

man the carrier knew, the only man the carrier saw; his directions were to deliver the cattle to the Peters Commission Company, and this the carrier did, nor can the City Bank take advantage of any form of contract, in any event, because the delivery to Peters Commission Company was caused (even if contrary to its own wishes) by the action of the City Bank in vesting J. A. Peters with plenary power to handle and ship the cattle as he saw fit.

· In this connection it is to be remembered that there had been other shipments that had been handled as this one was, and had been delivered to Peters Commission Company, and that the jury, in answer to question 5, found that in these prior shipments the cattle had been delivered to Peters Commission Company prior to the payment of the drafts, and that the City Bank knew of this and ratified and acquiesced therein, and that in answer to question 4, requested by plaintiff, the jury found that had the bill of lading actually consigned the cattle to First National Bank, care Peters Commission Company, the City Bank would not have notified the defendant not to deliver until the draft was paid.

[11] We come now to the evidence of mutual mistake, a great deal of which is also relevant as showing what Peters' instructions to the carrier and authority from the City Bank were.

In analyzing this testimony it must be borne in mind that we are simply to determine, as an appellate court, whether there is evidence to sustain the findings of the jury in answer to questions Nos. 1 and 2.

Stated succinctly, their findings are: (a) That it was mutually agreed between J. A. Peters (for the bank) and the agent of the receiving carrier that the ·cattle should be consigned by the bill of lading "In care Peters Commission Company." (b) That when the bill of lading was issued, by the mutual mistake of J. A. Peters and the agent of the receiving carrier, it omitted to state "care of Peters Commission Company."

The first material inquiry is: Why did the City Bank, through J. A. Peters, desire the cattle shipped so as to be delivered to the Peters Commission Company? The answer is:

(a) There had been no trouble or failure to pay drafts by the Peters Commission Company, and the City Bank had acquired confidence in them.

(b) There had been trouble in reference to the market—one shipment had been held for the Kansas City Bank to open in the morning, and the day's market had been lost.

It might well be that the City Bank (as found in plaintiff's question No. 4 to jury) preferred to ship them "so as to be delivered to Peters Commission Company."

The evidence of the lost market shipment

will be found on page 31 of Statement of Facts, and reference is made to the exact language of J. A. Peters:

"I know the reason why the cattle going to Kansas City were 'consigned' to J. A. Peters Commission Company in this particular case."

Note the language, "were consigned to"—out of the witness' own mouth we learn what he believed the transaction was—a consignment to Peters Commission Company. This is what he wanted and what'he intended; it was what the City Bank, through him, wanted and what it intended.

Appellant says this shows that Peters "waybilled" them to Peters Commission Company, but is there not at least an issue of fact here as to whether Peters did not intend to so consign them, and by mistake omitted to do so?

Again, in his testimony Peters says:

"It appears in those waybills that the cattle were consigned * * * care of J. P. Peters Commission Company. I billed them that way. As to whether I directed the clerk of the railroad that issued the bill of lading to bill them that way, that is the billing I gave the clerk of the railroad that issued the bill of lading."

Is this testimony all one-sided? Is it not clearly susceptible of the construction that the omission from the bill of lading of the words "care Peters Commission Company" was a mutual mistake?

Appellant says that the witness referred to the waybills, but does it not all show that the witness intended to ship the cattle "care Peters Commission Company"?

Take his statement, "The first shipments were not 'consigned' * * * care Peters Commission Company like this shipment was."

What does the word "consigned" mean? It does not apply to a waybill. It is applicable·only to a bill of lading.

The material questions are: (a) Did J. A. Peters intend to execute such documents as to make the cattle deliverable to Peters Commission Company? The answer is, indisputably, "Yes." (b) Did Peters omit the words "care Peters Commission Company" from the bill of lading by mistake? Clearly the facts, at least, show that there is evidence to support the jury's findings that he did.

On the carrier's side:

Wallwork testified:

"Waybills should be made out in conformity with the bills of lading, unless sometimes the contracts are made, and then they come around and ask you to add something on them, and the billing clerk is liable to forget to put it on the order. * * * It is an oversight of the railroad if they forget to put that on the contract. * * * In this bill of lading the consignor is City National Bank. Our waybills make them consignee care Peters Commission Company. That was not on the bill of lading that was an oversight there."

Jarvis, billing clerk, testified:

"J. A. Peters issued billing instructions on those cattle. His instructions were the cattle were billed from City National Bank to First National of Kansas City, care J. P. Peters Commission Company."

Again the use of the word "billed."

We have now: (a) Peters' intention to make the cattle deliverable to Peters Commission Company; (b) the railroad's custom or rule that the waybill and the bill of lading must correspond; (c) Jarvis' statement that J. A. Peters gave the billing instructions; and (d) Wallwork's statement that it was an oversight not to include "care Peters Commission Company" in the bill of lading.

We know this was a mistake on Peters' part, because he frankly states his purpose to make them deliverable to Peters Commission Company. We know it was a mistake on Jarvis' part, because, under his rules, the waybills and contract must correspond. We know it was a mistake on the carrier's part, because Peters was the only man they knew, he was as to them the shipper; he wanted them delivered to Peters Commission Company, and the carrier knew that waybill and bill of lading should correspond.

We think it clear that there was evidence sufficient to support an issue of mutual mistake, and the jury on that evidence has found that there was such mutual mistake.

This brings us to the case of Jones v. Flournoy, 37 S. W. 236, which appellant says, conflicts with this case.

In that case, Jones executed a deed to the railroad, one of the provisions of which was that a depot should be established on said railroad at Beeville.

At the time Jones signed, no one for the railroad being president, he had added the words :"and the establishment of the said depot on the herein described block of land."

The depot was established and has been maintained. Jones' suit was to have the deed reformed so as to require the use of the entire block of ground for depot purposes. This he asked on the ground of fraud and mistake.

The preparation of the deed was not participated ·in by the appellee; the provision that was inserted was put in by appellant himself.

The court held there was no fraud and that the very subject of the alleged mistake was considered by appellant when·he signed the deed, and the clause now attempted to be reformed was supplied by him. The mistake, if any, was unilateral and not of the character that equity will relieve against. There is clearly no conflict between the decision in this case and the decision in Jones v. Flournoy.

On the other hand countless authorities could be adduced that a mutual mistake

made in drawing a contract may be alleged, and, if satisfactorily established by evidence, the instrument may be reformed and a decree entered accordingly. Gammage v. Moore, 42 Tex. 171.

[12] We now come to the appellant's contention that since the Carmack Amendment no verbal contract is permissible.

As said before, a reference to the cases cited by appellant will show that the United States and other courts have held that since the Carmack Amendment a verbal contract conflicting with the carrier's tariff and schedules will not be recognized. The reason for this is apparent. Under the Interstate Commerce Act, the rates and schedules are embodied in the tariffs. Not even the carrier can depart from it. To do so is a criminal offense. It follows, of course, that neither the carrier nor the shipper, nor both together, could make either a verbal or a written contract, which did not comply with the tariff and schedules.

This question is incidentally discussed in the case of G., C. & S. F. v. Vasbinder, 172 S. W. 763.

[13] It is to be borne in mind that there is no question here of a verbal contract, but the question is whether a written contract, which, by mutual mistake, omits to state the true consignee, that the parties agree upon, whether the true consignee can be ascertained by parol.

To state this question is, of course, to answer it. It has been the law since time immemorial that the true intent and meaning of a written agreement can always be shown by parol, when the omission is caused by fraud or mutual mistake. The very case of Waco Tapp Railroad v. Shirley, 45 Tex. 377, which the appellant cites, is very good authority for that proposition.

[14] As to the contention of the appellant that mutual mistake must be shown with certainty, it may be said in a sense every fact must be shown with certainty. For a discussion of just what certainty is required, see Mortgage Co. v. Pace, 23 Tex. Civ. App. 222, 56 S. W. 377. It will not do to submit to the jury that given facts must be found to their satisfaction, or must be proved with clearness, or a certainty, because that requires a heavier burden than the law requires.

See Rutherford v. Basham, 38 S. W. 381; Sabine Tram v. Bancroft, 39 S. W. 177; Rodriguez v. Espinosa, 25 S. W. 669—which authorities all establish that the question should be submitted to the jury in the ordinary form and with the ordinary tests, and that, having answered in the affirmative, the question of mutual mistake is established.

To briefly recapitulate this case, the City Bank never complained in its pleadings, that the carrier delivered without the production of the bill of lading. Its sole and only allegation was that the carrier did not deliver to the consignee named in the bill of lading, the First National Bank.

Upon inquiry before the jury, it has ascertained that J. A. Peters, the agent of the bank, had instructed the carrier to deliver to the Peters Commission Company; that both he and the carrier had intended to put this instruction in the waybill and the bill of lading; that by mutual mistake they omitted it from the bill of lading; that the carrier, in compliance with instructions, had delivered the cattle to the Peters Commission Company.

In the face of these findings and upon the issues presented by the appellant's pleadings, we see no escape from the conclusion that judgment was properly rendered for the appellees.

The Carmack Amendment, nor any other law, is intended as an instrument of oppression. The natural justice with which we are all imbued revolts at the idea of allowing the City Bank to, on the one hand, instruct the carrier to deliver the cattle to the Peters Commission Company, and, on the other hand, to sue for damages for not delivering them to the First National Bank.

In addition to this, it is shown in the case that there were many other lots which were delivered to the Peters Commission Company, in accordance with the City Bank's instructions, and in every instance those deliveries were known to the bank, and it did not complain of them, but, on the other hand, acquiesced in and ratified such deliveries.

For the reasons indicated, the motion for rehearing is overruled.